Argued January 13; affirmed February 25, 1942

# WESTERMAN *v.* OREGON AUTOMOBILE
## CREDIT CORPORATION ET AL.
### (122 P. (2d) 435)

Before KELLY, Chief Justice, and BAILEY, RAND, ROSSMAN and BRAND, Associate Justices.

*Paul R. Harris,* of Portland (C. J. Stocklen and Andrew Hansen, both of Portland, on the brief), for appellant.

*Marvin S. W. Swire,* of Portland (Coan & Rosenberg, of Portland, on the brief), for respondents.

BRAND, J. This is an action, as asserted by the plaintiff, "for trespass to a motor vehicle and its

contents.'' From a judgment of involuntary nonsuit plaintiff has prosecuted this appeal. The complaint alleges in substance that on the 13th day of January, 1940, the plaintiff, being the owner of a Ford car, borrowed money from the defendant, Oregon Automobile Credit Corporation (hereafter called the company), and to secure the loan executed a chattel mortgage upon the car. The complaint alleges further:

"That on or about the 9th day of March, 1940, while the plaintiff was enjoying the use, ownership and possession of said automobile, the defendants unlawfully, wantonly and maliciously, and in disregard of plaintiff's rights in and to said property, and without plaintiff's consent, and with intent to deprive plaintiff of his rights in and to said property, and with intent to oppress plaintiff, endeavored to obtain possession of said automobile by seizing the same with force and violence, and over the protest and against the will of the plaintiff; and while so doing trespassed upon said property, all to plaintiff's general damage in the sum of $100.

"That while doing the acts heretofore alleged, defendants obtained the keys to the rear portion of the automobile in which was stored certain meat owned by the plaintiff, which subsequently spoiled; and defendants also broke a glass door in said automobile and damaged a tire; all to plaintiff's special damage in the sum of $15.00.''

For a second cause of action the plaintiff makes similar allegations and charges that the defendant on the 17th day of April, 1940, took possession of the same automobile, maliciously and without plaintiff's consent, "and while so doing trespassed on said property, all to plaintiff's damage in the sum of $100.'' It is alleged that on this occasion also there was in the automobile certain meat owned by the plaintiff, which sub-

sequently spoiled; all to plaintiff's special damage in the sum of $1.50. Punitive damages are sought on both causes. The only question upon this appeal relates to the propriety of the judgment of involuntary nonsuit.

The mortgage provides that in the event of default the note shall become immediately due and payable, and the mortgagee is authorized to foreclose, at its option, by taking immediate possession of the car wherever the same shall be found without prior notice or demand for performance, said notice being waived, and to sell the same at private sale. While the plaintiff was in default, defendant company, by its agent, the defendant Hoffmiller, went to the plaintiff's home to get the payment or get the car. Defendant Hoffmiller advised the plaintiff that he was going to take the car, whereupon the plaintiff said, "You can't take the car without law." Defendant Hoffmiller then left plaintiff's home, and the plaintiff, who is a meat peddler, drove his car from his home in South Portland to the corner of S. E. 8th and Rhine streets, where he stopped and parked the car in front of but across the street from the home of a Mr. Therrell. The plaintiff left the car with the keys in it and crossed the street and went up to the Therrell house to transact some business. The evidence fails to show whether he went to the front or rear door, whether he went into the house or remained outside, the distance from the car to the house, or whether the car was visible from the house. It also fails to show how long the plaintiff remained at the Therrell house.

What next occurred appears from the plaintiff's testimony as follows:

"A. After I went to the car, there was a man sitting in my car and I said, 'What are you doing in my

car?' Well, he was sitting in the car as I come and opened the door, and I says, 'what are you doing here?' and he says, 'I take the car.' And I says, 'You don't take the car.' I says 'You get the Sheriff or Constable or by law is the only way you get that car,', and I pressed myself in there and he grabbed my foot and hurt my leg here (indicating), I can show you and then Mr. Hoffmiller   *   *   *

"Mr. Rosenberg: (Interrupting) I object; there is no allegation of any assault and battery.

"Mr. Harris: This is really to show how they acted here, we are not claiming any personal injury.

"The Court: I will instruct the jury at the proper time that there is no claim for damage for assault.

"Q. Go on from there, Henry.

"A. And Mr. Hoffmiller, he took my arm and pulled me out, and I got in at last, he said "Get the key," and he called me all kinds of names.

"Q. Who did he tell to get the key, the other man?

"A. Yes, the other man, he told him to take the key out.

"Q. Without repeating any of the language, was it pretty bad language?

"A. It was the worst language I ever heard. He must have gone to high school to have learned that language.

*   *   *   *   *   *   *

"Q. Did they get the key, Mr. Westerman?

"A. He took the key out then, yes.

"Q. And then what happened?

"A. Well, then I ———there were two keys for the back and front, and it happened there was another key and I had the key and I wanted to drive off and they took the wires off.

*   *   *   *   *   *   *

On cross-examination the plaintiff testified as follows:

"Q. Now, was Mr. Hoffmiller's car near your car at the time you went off the steps of the Therrell house back to your automobile?

"A. I didn't see him at all until I stepped in my car, and I see one, and there was a car behind me, and there was a fat fellow in the car.

"Q. It wasn't this gentleman?

"A. No.

"Q. And had he started the motor?

"A. No, sir.

"Q. He was sitting in the driver's seat?

"A. Yes.

"Q. And was the key in the car?

"A. Yes, the key was in the car.

"Q. And you approached the car and you asked him to get out?

"A. Yes.

"Q. Did he get out?

"A. I got him out, sure.

"Q. You got him out?

"A. I pressed me in there and he got out, he didn't say a word at all, he was a gentleman all right.

"Q. Who didn't say a word?

"A. That man, he didn't say a word.

"Q. What did he do when you asked him to get out?

"A. He got out.

"Q. He got out?

"A. No, I had to press all right to get him out.

"Q. You had to what?

"A. I put my legs in, he was sitting under the wheel and I went on that side and I pushed him away.

"Q. You pushed him away?

"A. Yes, I pushed him away.

"Q. And when you pushed him away ———

"A. (Interrupting) That nice fellow was pulling on my arm.

"Q. Who?

"A. That nice gentleman over there, (indicating Mr. Hoffmiller).

"Q. Did the other gentleman touch you at all?

"A. No, the other gentleman didn't touch me, only I cracked my shin, is all. He put his foot on it, he wanted to stay in there.

"Q. I understood you to say, when you asked him to get out he got out?

"A. He got out, I pushed him out.

\* \* \* \* \* \* \*

"Q. Now, when this man got out after you ordered him out, did he take the key with him?

"A. Yes, sir, he took the key with him. Hoffmiller told him to take the key, he said.

"Q. Did you remain in the car after that man got out?

"A. Yes, I remained in the car. The other fellow went away and I heard some whistling and I went out of the car and I went around there and he was letting the air out.

"Q. Who was letting the air out?

"A. Hoffmiller.

"Q. And when you told him to get away, did he get away?

"A. You bet he got away, or he would have got that rock.

\* \* \* \* \* \* \*

"Q. When, if at all, was the air let out of the tires?

"A. I heard a whistle and I walked out and I says, 'you get away from there, you have no right to touch that car,' and he got away then. I grabbed a brick.

"Q. You grabbed a brick or a rock?

"A. Yes.

"Q. And he was letting the air out of the tire?

"A. Yes, he was letting the air out of the tire, but he got away all right."

\* \* \* \* \* \* \*

The plaintiff with assistance then replaced the disconnected wires and drove the car to the home of a friend on 63rd street. Plaintiff testified further as follows:

"Q. During that altercation or commotion or whatever you want to call it out there, what happened to the glass in one of the doors?

"A. That was the door, the glass was busted a little and I couldn't wind it up no more, the hangers was out of it or something like that, it was broke.

"Q. And what did it cost to replace that glass?
"A. It cost about $4.50."

\* \* \* \* \* \* \*

There is no evidence that any damage was done to the tire in the process of letting a portion of the air out. The only evidence as to the cause of the alleged damage to the tire is found in the fact that plaintiff immediately drove the car a considerable distance in its partially deflated condition after the altercation. There is no evidence as to who caused the alleged damage to the glass in the door or when it was caused or the circumstances thereof.

Plaintiff's claim for damage to the meat is based on his testimony that the defendants had appropriated the key to the rear compartment along with the transmission key. However, he testified that there were two keys for the back and front, and no explanation is given as to who was possessed of the second key to the rear compartment. Plaintiff, however, does complain that he was unable to open the rear compartment from Saturday until the ensuing Monday. On Monday a friend of plaintiff requested the defendants to send over the key to the rear compartment, and they immediately did so. There is no evidence that defendants were advised of the alleged fact that there was any meat in the rear compartment, until Monday.

After plaintiff made away with the automobile on March 9th, he retained possession of it and used it in his business until April 17th, on which date he left it

unattended on the street, and the defendants, without his consent, took possession of it.

The foregoing is a fair summary of the testimony favorable to the plaintiff.

■■ We will consider first the alleged trespass of March 9th. The condition of the mortgage having been broken, defendant was entitled to foreclose in the manner provided by that instrument. 5 O. C. L. A. § 68-209; *Ashley & Rumelin v. Lance*, 88 Or. 109, 171 Pac. 561 (1918). By the terms of the mortgage, as well as by statute, the defendant company then had a qualified ownership of the chattel, together with a right to immediate possession thereof. 5 O. C. L. A. § 68-208; *Templeton v. Lloyd*, 59 Or. 52, 109 Pac. 1119 (1910), 115 Pac. 1068 (1911); *Lynch v. Sable*, 122 Or. 597, 260 Pac. 222, 55 A. L. R. 180 (1927); *Commercial Securities, Inc. v. Mast*, 145 Or. 394, 28 Pac. (2nd) 635, 92 A. L. R. 194 (1934).

■ A consideration of the various types of action for trespass as known to the common law will greatly clarify the issues here. A plaintiff may sue for trespass to the person, he may sue for wrongful invasion of real property, or he may sue for trespass de bonis asportatis to chattels. The plaintiff here is suing for "trespass to a motor vehicle". The complaint contains no direct allegation of any assault, battery or false imprisonment of the person, and as the quoted testimony clearly shows, counsel for the plaintiff announced that he was not claiming any personal injury, whereupon the court without objection or exception stated that it would instruct the jury at the proper time that there was no claim for damage for assault. Clearly there was no invasion of plaintiff's land or his home, for the car was taken on a public street.

■ In an action for simple trespass in the taking of a chattel, the immediate right to possession on the part of the taker is a complete defense.

"One who is entitled to the immediate possession of a chattel is not liable to another for dispossessing him of it." 1 Restatement of the Law of Torts, P. 669, § 272. 63 C. J. P. 950, § 106.

There are qualifications to this rule which will be considered later, but the point now made is that, considered as a simple case of alleged trespass de bonis asportatis, there would be no liability here and that liability, if any, could arise only if in the taking there was an invasion of plaintiff's rights of *personality*, as distinguished from personalty. See 1 Restatement of the Law of Torts, P. 25 and P. 247 § 117. Since there was no invasion of plaintiff's land and no claim for assault and battery the very foundation of plaintiff's case becomes weakened. However, despite the insignificance of the controversy in the instant case the problems of law involving the right of mortgagees to take possession of chattels after condition broken is of great importance, and it requires detailed consideration.

■ The plaintiff contends that the right of a mortgagee upon condition broken to repossess a chattel without the aid of legal process can be exercised only if the plaintiff consents and that if possession is taken in defiance of plaintiff's objection, the taker becomes a trespasser. On the contrary, we hold that, where there is no invasion of plaintiff's rights relative to real property and no force is involved against the person, one having an immediate contractual right to the possession of the chattel may take the same notwithstanding the

absence of consent or the verbal refusal to consent by the mortgagor. In doing so, he commits no trespass.

"A person may be entitled to the immediate possession of a chattel as the result of some past transaction. Thus, a conditional sale vendor or a chattel mortgagee may repossess a chattel from his vendee or mortgagor upon failure of the latter to comply with the terms of the contract if a valid agreement between the parties so provides. This is so although at the time of the repossession the vendee or mortgagor expresses an unwillingness for the vendor or mortgagee to take possession of the chattel. * * *" 1 Restatement of the Law of Torts, P. 669, § 272-b.

*Willis v. Whittle*, 82 S. C. 500, 64 SE 410, is quoted with approval in *Lange v. Midwest Motor Securties Co.*, 231 SW 272 (Mo., 1921), as follows:

"It is well settled that, after condition broken, the legal title to mortgaged chattels vests in the mortgagee. The right of the mortgagee to seize mortgaged chattels, after condition broken, is a license coupled with an interest, which cannot be revoked by the mortgagor. It is a part of the consideration of the mortgage, and to allow the mortgagor to revoke it would be a fraud upon the rights of the mortgagee, and would very much impair the value of chattel mortgages as securities."

Speaking of contractual provisions authorizing mortgagees to take immediate possession upon condition broken, the Texas court states the rule as follows:

"The proposition that such a stipulation is valid, and that the mortgagee may take peaceable possession of the property without the consent, and even over the protest, of the mortgagor, is sustained by the great weight of authority." (Citing many cases, *Singer Mfg. Co. v. Rios*, 96 Tex. 174, 71 SW 275, 60 L. R. A. 143, 97 Am. St. Rep. 901 (1903).

The following authorities directly support the rule as set forth in the Restatement, supra: *First National Bank v. Winter*, 176 Okla. 400, 55 Pac. (2nd) 1029 (1936); *Leedy v. General Motors Acceptance Corporation*, 173 Okla. 445, 48 Pac. (2nd) 1074 (1935); *Malone v. Darr*, 178 Okla. 443, 62 Pac. (2nd) 1254 (1936); *Runnels Chevrolet Co. v. Clifton*, 46 SW (2nd) 426 (Texas, 1932); *Eagle Furniture Stores v. Jones*, 110 SW (2nd) 610 (Texas, 1937); *Waggoner v. Koon*, 67 Okla. 25, 168 Pac. 217 (1917); *J. I. Case Threshing Mach. Co. v. Barney*, 54 Okla. 686, 154 Pac. 674 (1916); *Fulton Inv. Co. v. Fraser*, 76 Colo. 125, 230 Pac. 600 (1924); *Childers v. Judson Mills Store Co.*, 189 S. C. 224, 200 SE 770 (1939); *Day v. National Bond & Investment Co.*, 99 SW (2nd) 117, (Mo., 1936); and see Annotation in 57 ALR, page 26. Contra: see *McClellan v. Gaston*, 18 Wash. 472, 51 Pac. 1062 (1898), and *Ben Cooper Motor Co. v. Amey*, 143 Okla. 75, 287 Pac. 1017 (overruled on this point in *First National Bank v. Winter*, supra).

■ We shall next consider the manner in which one having the immediate right to possession may take it. In general terms it may be said that he must not commit a breach of the peace in the process of taking. This rule may be broken down into two separate categories. The first relates to the invasion of the mortgagor's rights of personality, as that phrase is employed in the Restatement. 1 Restatement of the Law of Torts, P. 25. The second relates to the invasion of the mortgagor's rights by reason of the manner of taking when on his land or within his building or home. The mortgagor in the case at bar had acquired possession rightfully. His wrong consisted in the detention after condition broken. Under these circumstances a mortgagee has no right to employ force

against the person of the mortgagor for the purpose of securing possession.

"The use of force against another for the purpose of recaption of a chattel, which the other is tortiously withholding from the actor, is not privileged if the other's possession was rightfully acquired."

The meaning of this section is clarified by section 117, wherein it is said:

"The words 'use of force' are used to describe conduct which invades any of another's interests of personality and so is, unless privileged, a 'battery', 'assault' or 'false imprisonment.' "

Specifically, then, the mortgagee may not commit an assault, battery or false imprisonment in the process of taking possession.

The plaintiff cites the following cases in which the taking was held to be tortious, but in each instance, in the act of taking possession, the defendant had exerted force against the person or the equivalent of force under the local law: *Biggs v. Seufferlein,* 164 Iowa 241, 145 NW 507, L. R. A. 1915 F, 673 (action for assault and battery where the plaintiff sat upon a stove when the defendant attempted to remove it from plaintiff's house, and defendant pulled her away and struck her); *Firebaugh v. Gunther,* 106 Okla. 131, 233 Pac. 460, (1925), (where the defendant secured the services of a deputy sheriff to take possession of property owned by the executor of the deceased mortgagor and in the custody of the widow. The sheriff stated that he was going to take the property and did not want to make any trouble; held that his conduct constituted intimidation amounting to force. Defendant "must not intimidate by securing the aid of an officer who pretends to act colore officii.") *McClure v. Hill,* 36 Ark. 268, (where the court said: "The taking by color of legal

process to which plaintiff yielded was in fact a taking by force and trespass." Defendant had employed a constable who acted under legal process issued by a justice of the peace beyond his jurisdiction.) But see *Day v. National Bond & Investment Co.*, 99 SW (2nd) 117 (Mo.) (1936) as to taking "colore officii".

■ Again, where the taking is on the land of the mortgagor, the law wisely imposes restrictions which do not apply when the taking is in a public place. A chattel mortgagee entitled to immediate possession and having the contractual right to take the chattel "wherever it may be found" has a right to enter the land of the mortgagor for the purpose of taking possession and removing the chattel, but he is privileged to do so only at reasonable times and in a reasonable manner. "Except as otherwise agreed, a conditional vendor or lessor of a thing who is entitled to immediate possession thereof, or a successor to his legal interest in the thing, is privileged, at reasonable times and in a reasonable manner, to enter land in the possession of the vendee or lessee, for the purpose of taking possession of the thing and removing it from the land.

      \*     \*     \*     \*     \*     \*     \*

"The privileges stated  \*  \*  \*  are also available to \*  \*  \*  a chattel mortgagee  \*  \*  \*." 1 Restatement of the Law of Torts, § 183, P. 437.

The plaintiff cites the following cases in which the defendant was held liable, but in each instance the taking by the defendant was accomplished by violent or unreasonable means and upon plaintiff's property or in his home. They differ materially from the facts in the instant case: *Childers v. Judson Mills Store Co.*, 189 S. C. 224, 200 SE 770 (1939), (where the plaintiff left his house securely locked and, the defendant broke and entered the dwelling in plaintiff's absence

and removed a refrigerator; held that whether or not there was a breach of the peace was a question for the jury. There was ample evidence of a taking in an unreasonable manner within the meaning of the rule of the Restatement, supra); *Kilpatrick v. Haley*, 66 Fed. 133 (1895), (where the mortgagee forced an entrance through an upper window by violence and threats of shooting. Here there was a taking from plaintiff's building in an unreasonable manner and also an assault); *Butcher v. Bell*, 198 SW 1123 (Mo. A.), (where the defendant forcibly ejected plaintiff's agent from the store of the plaintiff and padlocked the building which contained goods of the plaintiff not covered by defendant's mortgage); *Bordeaux v. Hartman Co.*, 115 Mo. A. 556, 91 SW 1020 (1906), (where defendants, having been notified not to enter plaintiff's home, nevertheless secured permission from plaintiff's wife who became hysterical and thereafter went insane. The court said that the plaintiff's evidence showed that she was intimidated by the superior force arrayed against her, although there was no technical assault). The foregoing cases are clearly distinguishable from those in which the mortgagee took possession of a mortgaged automobile upon the public street.

In the following cases the mortgagee took possession upon the public street, and it was held that there was no liability notwithstanding the refusal of the plaintiff to surrender the car: *First National Bank v. Winter*, supra; *Leedy v. General Motors Acceptance Corp.*, supra; *Lange v. Midwest Motor Securities Co.*, supra; and see *Gaffney v. O'Leary*, 155 Wash. 171, 283 Pac. 1091. In *Commercial Credit Co. v. Spence*, 185 Miss. 293, 184 So. 439 (1938), the plaintiff left his car upon a parking lot, closed, locked and in gear. The de-

fendant broke out one of the windows of the car, obtained access and had the car towed to a storage room. The plaintiff recovered. Here the taking involved neither a trespass to the person nor an invasion of plaintiff's real estate, but it may be distinguished by the fact that the defendant intentionally broke a window of the car, thereby reducing the value of the chattel which he held as security. In *Webber v. Farmers Chevrolet Co.*, 186 S. C. 111, 195 SE 139 (1938), the complaint alleged that "regardless of the efforts of the plaintiff to retain possession of the car which was at his home and in his possession, the said agent forcibly, willfully, highhandedly and unlawfully seized the automobile." The trial court granted a nonsuit, but upon the sole ground that the complaint did not state facts sufficient to constitute a breach of the peace. The supreme court, giving consideration only to the condition of the complaint, held that it sufficiently alleged tortious conduct. The complaint also alleged that the plaintiff had stated to the agent of the defendant that the plaintiff was then ready and would pay the sum of $71.40 to cover the installments in arrears. Thus, the decision may have been based on the court's conclusion that the defendant was not entitled to the immediate possession of the car. In the Webber case the court relied upon *Lyda v. Cooper*, 169 S. C. 451, 169 SE 236 (1933), and *Peeples v. Brown*, 42 S. C. 81, 20 SE 24 (1894). Both of these cases were clearly distinguishable. In the case of *Texas Auto Co. v. Clark*, 12 SW (2nd) 655 (Texas, 1928), cited by the plaintiff, the plaintiff, who was in default, offered to pay the balance due on the car, drove defendant to the bank for the purpose of getting the money, and as plaintiff disappeared in the building the agent drove off in the car. The plaintiff very properly recovered.

But in this case there was an offer to pay the balance due ⁻coupled with a refusal which the court held amounted to a tender which discharged the lien of the mortgagee. The taking was therefore clearly a conversion, for the mortgagee no longer was entitled to the immediate possession of the car. The jury also found by special verdict that the defendant obtained possession through fraud, stealth, trespass and threats. The case is clearly distinguishable. In *Wilson Motor Co. v. Dunn*, 129 Okla. 211, 264 Pac. 194, 57 A. L. R. 17 (1928), the mortgagee broke open the building containing the mortgaged car and removed the same, notwithstanding the fact that it was then in custodia legis. The latter circumstance clearly warrants judgment against the mortgagee and also distinguishes the case from the one at bar.

■ The mere use of force upon the chattel as in the lifting or removing thereof or in the entry of a car is not tortious when committed by a mortgagee having immediate right of possession. His duty in this respect is merely to deal with the chattel in such manner as not to damage it, thereby lessening its value as security. These principles will, we think, harmonize the authorities which at first appear to be in hopeless confusion.

■ The plaintiff places his chief reliance on *Lamb v. Woodry*, 154 Or. 30, 58 Pac. (2nd) 1257, 105 A. L. R. 914 (1936). In that case the plaintiff brought an action for assault and battery, and her evidence showed that she had bought a stove on conditional sale and had installed it in her home. The defendant, being entitled to the immediate possession of the stove by reason of her default, went to the plaintiff's home to repossess the stove. The plaintiff first asked defendant to wait until her husband returned from his day's work in order that he might make a satisfactory adjustment, but

defendant insisted upon immediate repossession. The plaintiff refused defendant permission to take the stove. She also obstructed defendant in his effort to take it and secured the aid of a third party to prevent the taking. The defendant and the third party both took hold of the stove, and a scuffle ensued; burning wood was thrown from the stove onto the floor, and the plaintiff was pushed away by the defendant, she being at the time pregnant. Defendant threatened criminal prosecution. This testimony raised a jury question, and the verdict was for the plaintiff. Here was a finding of assault, battery and intimidation of the person. Here also was a recaption in the plaintiff's home which "was her castle" committed in a manner which the jury was entitled to find was at an unreasonable time and in an unreasonable manner and which therefore might constitute a trespass quare clausum fregit. The following instruction was given and upon appeal was approved by this court. We again approve it. The instruction was as follows:

"I instruct you that where the buyer of personal property on a conditional sales contract makes default in payment, and the seller, by the terms of the contract is authorized, in such event, to retake the property, the seller is entitled under this power to repossess the property if he can do so peaceably, but if the buyer objects and protests against such retaking, and obstructs the seller in doing so, it is the duty of the seller to proceed no further in such attempted retaking, but to resort to legal process to enforce his right of repossession. The seller is not entitled to use force to retake possession of such property and if he does and in so doing touches the resisting person he is guilty of assault and battery."

The gist of this instruction was that if the buyer objects and protests and *obstructs* the seller it becomes

the duty of the latter to desist. If the mortgagor or conditional buyer resists and places his body in a position which obstructs the mortgagee or vendor so that in order to take the chattel he must necessarily apply force, however slight, to the person then he must desist and resort to legal process. He must not, in attempting to take possession, even commit an assault, thus putting the mortgagor in apprehension of hostile unpermitted physical contact, though no such contact occurs. In the Lamb case, the court relies on the annotation in 9 ALR 1180 where again the elements of objection, protest *and obstruction* are mentioned. It is there said, "He is not entitled to use force, and he is guilty of assault and battery or of trespass, as the case may be, if he does so." These authorities cannot be construed as prohibiting recaption unless the mortgagor consents. Such a construction would be contrary to the great weight of authority cited above. In *Lamb v. Woodry* there is one sentence which, if taken out of its context, might be thought to squint at the rule for which plaintiff contends. Speaking of the right of recaption, the court said:

"* * * But this right may be exercised without the aid of legal process only when the purchaser consents thereto. In case the purchaser refuses to consent or affirmatively objects, the seller's only recourse is by legal proceedings. * * *"

The meaning of the court is made clear in the following sentence:

"In such a case if the seller proceeds in defiance of the purchaser's objection *and resistance*, the seller becomes the aggressor." (Italics ours.)

To permit one who agreed, for a valuable consideration, that in the event of default the mortgagee

may take possession wherever the chattel may be found, to revoke that consent by mere words would be permitting him to destroy the contract by his own wrong. The rule which prohibits the mortgagee to use force was not adopted for the purpose of protecting the mortgagor in the wrongful withholding of a chattel; it was adopted to prevent a breach of the peace by the mortgagee. The Lamb case is distinguishable from the case at bar in many respects. That was an action for assault and battery; this is an action for trespass to chattels. That was a taking in the plaintiff's house; this was a taking on the public highway. In that case there was physical obstruction as well as refusal to consent. In this case, although there was refusal to consent, there was no physical obstruction. No violence would have occurred if plaintiff had not interfered after defendants had taken possession. The taking of possession was in fact consummated by defendants without assault, battery or intimidation and during the absence of the plaintiff.

We do not mean to hold that the mortgagee has a right to indulge in a race for the possession of the car if it is reasonably probable that he will by his own action come in physical contact with the mortgagor, but here the defendant and his assistant were in actual physical and peaceable possession of the car, the key being therein, when the plaintiff first saw them on returning from the Therrell home. We are aware that there are a few authorities holding that the mortgagee should not provoke a breach of the peace, as distinguished from committing one. Concerning this proposition the Texas court said:

"The question then arises, what consequence, injurious to the public, is a stipulation of the character of that

under consideration calculated to produce? To this it may be vaguely answered that it tends to a breach of the peace. But the reply is, so do many other contracts, the validity of which are never called in question. Certainly no breach of the peace is likely to occur provided the mortgagor in such case does what he has contracted to do, namely, in case of default to surrender the property upon demand of the mortgagee. On the other hand, should he make forcible resistance, this does not justify the mortgagee in using force to overcome his resistance. The law hardly proceeds upon the assumption that either party will violate his agreement, and that therefore a breach of the peace may arise." *Singer Mfg. Co. v. Rios* (supra).

The defendant was not required to presume that the plaintiff would become so provoked at the lawful action of the defendant as to commit a breach of the peace. Undisputed evidence establishes that the plaintiff was himself the aggressor when he pushed himself in the car and pushed the defendant's assistant out of it. The defendant being entitled to the immediate possession of the car and having taken lawful possession was privileged to use force so far as reasonably necessary for the purpose of defending such possession. 1 Restatement of the Law of Torts, Sec. 109, and Secs. 77 to 87. We conclude that there was no substantial evidence that the taking of the car by the defendant was tortious.

█ It is alleged in the complaint that there was meat stored in a locked compartment in the rear of the car and that it "subsequently spoiled", although the time and cause thereof are not alleged. At all times subsequent to the date of the original demand for possession by the mortgagee, the plaintiff was unlawfully retaining possession of the car. He cannot now con-

tend that the case should be sent back for a new trial on the issue of the spoiled meat, when without notice to the defendant he had wrongfully locked the meat in the car which he was wrongfully withholding.

If, as we think, the judgment of involuntary nonsuit was properly rendered upon plaintiff's first cause of action, a fortiori it was properly rendered upon the second cause.

The judgment of the circuit court is affirmed.