Argued October 4, 1962, reargued February 6, affirmed as
modified February 14, 1963

# LUKAS *v.* J. C. PENNEY COMPANY

### 378 P. 2d 717

*James W. Morrell,* Portland, argued the cause for appellant. With him on the brief were Tooze, Powers, Kerr, Tooze & Morrell.

*Roscoe C. Nelson,* Portland, argued the cause and filed the brief for respondent.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and DENECKE, Justices.

ROSSMAN, J.

This is an appeal by the defendant, J. C. Penney Company, from a judgment which the circuit court entered in favor of the plaintiff in an action which averred that the defendant wrongfully detained the plaintiff in the defendant's custody upon a false claim that she had shoplifted a dress from one of the defendant's Portland stores. The answer, in addition to denials, pled that if the defendant detained the plaintiff, the detention was made in good faith and with reasonable cause for believing that plaintiff had committed the crime of shoplifting. It alleged that all of

the defendant's conduct was in good faith, in a reasonable manner, and for no more than a reasonable length of time. The jury's verdict and the court's resulting judgment were in the sums of $4,000 general damages and $500 punitive damages.

The first and the second assignments of error challenge respectively rulings which denied the defendant's motions for an involuntary nonsuit and a directed verdict. The third is based upon a ruling which denied the defendant's motion to withdraw the plaintiff's averments of malice "on the ground that there is no evidence here of malice sufficient to take the issue of punitive damage to the jury." The fourth assignment of error is based upon the refusal to charge the jury that "the defendant's employee had reasonable cause under the statute, which is Section 164.392, ORS,— reasonable cause to detain and interrogate the plaintiff and remaining for the jury the only question as to whether or not the method and time of detention was reasonable." The fifth (the last) assignment of error complains because the trial judge denied the defendant's motion to strike from the complaint the averments that the plaintiff was subjected to a search.

We will now consider the fourth assignment of error and in so doing will take note of the episode which resulted in the institution of this action.

ORS 164.392, above mentioned, provides:

"(1) Notwithstanding ORS 133.550 and subsection (2) of ORS 133.560, a peace officer, merchant or merchant's employe who has reasonable cause for believing that a person has committed the crime of shoplifting under subsection (1) of ORS 164.390 may detain and interrogate such person in regard thereto in a reasonable manner and for a reasonable time.

"(2) Where a peace officer, merchant or merchant's employe, with reasonable cause for believing that a person has committed the crime of shoplifting as defined under subsection (1) of ORS 164.390, detains and interrogates him in regard thereto, and such person thereafter brings against the peace officer, merchant or merchant's employe a civil or criminal action for slander, false arrest, false imprisonment, assault, battery or wrongful detention based upon the detention and interrogation, such reasonable cause shall be a defense to the action if the detention and interrogation were done in a reasonable manner and for a reasonable time."

In midafternoon of November 11, 1959, the plaintiff and her granddaughter entered the store of the defendant which is located at Fifth and Washington Streets in Portland and went to the dress department where they hoped to find a white dress suitable to the needs of the granddaughter whose name is Barbara Lukas. The defendant's dress department is upon the second floor of its building. In the morning of that day Barbara had gone to the plaintiff's home and had helped her grandmother with housecleaning. At the conclusion of that work Barbara placed her work clothes in her grandmother's shopping bag and then the two went downtown and eventually entered the defendant's aforementioned store. When they went upon their shopping tour Barbara carried with her the shopping bag and its contents.

Before the two reached the defendant's dress department they visited similar departments in other stores. When they came to the defendant's dress department no clerk was available so they took a couple of dresses from a hanger into one of the dressing rooms and Barbara tried them on. Presently a clerk (Mrs. Groom) approached the dressing room and after speak-

ing to the plaintiff brought some dresses. Barbara tried on the dresses which were rendered available to her, but none of them seemed suitable except a white one. Upon that development the plaintiff recommended that Barbara should keep the white dress in mind and that before making a choice they should visit a store known as Bedell's. She further testified that since the hour was in the vicinity of 4:30 p.m. she suggested that they should proceed rapidly lest the Bedell store close before they could reach it. Barbara acquiesced and redressed. In the meantime the plaintiff returned some dresses to the racks. When Barbara was prepared to leave, the two looked for a clerk, but finding none returned, so they swore, the white dress to a rack and left for Bedell's. When they had gone a few feet upon the Fifth Street sidewalk toward Bedell's the incident occurred upon which this case is based. In describing it the plaintiff (referring to Barbara as Jeanie) testified:

"We got down about halfway to the corner from the store and that is Washington Street corner there, and there was a man come running up behind us and he said we had a white dress in that shopping bag. And Jeanie, she told him, 'If you want to see in that shopping bag, you show your credentials.' He said, 'I don't have to show anything,' he said. And so he kept pulling at the bag and he kept getting so loud and boysterious-like [sic] and so I was afraid that he might get so mad he might hit one of us because we wouldn't let him have the shopping bag; I took a hold of the shopping bag to keep him from jerking it away from her. And so then he kept getting more louder and boysterous [sic] and all of this bunch of people standing on the corner there, they was a-looking at us, and I was so embarrassed and upset about the whole thing. And Jeanie, she started to cry. And so I said to him, I said, 'If you want to see in this

shopping bag,' I said, 'there is no white dress in there and no dress of any kind,' but I said, 'I will let you see into it,' because I was getting scared. * * *"

The store employee concerning whom the plaintiff spoke was Mr. Paul N. Hales. When he was granted permission to do so, he looked into the shopping bag but found no dress. He then returned to the store.

Mrs. Groom swore that when she first saw the Lukases she was waiting upon a customer, but spoke to them and brought a couple of dresses to them. She then returned to her customer. Later, when she saw the plaintiff again Barbara had on the white dress and, concerning it she (Mrs. Groom) inquired of the plaintiff, "Have you decided on this one?" and received the reply, "Yes." She further testified that she thereupon wrapped her customer's parcel and after handing it to her "went back to the dressing room and there was nothing there except an empty hanger." By "the dressing room" she referred to the one the Lukases had used. By that time the plaintiff and her granddaughter had left. We quote again from Mrs. Groom's testimony:

"Q Now, did you look on the rack to see if the dress was back there on the rack?
"A Yes, sir.
"Q Did you find the dress?
"A No, I didn't."

She next swore that she reported the incident to her superior (Mrs. Turnage) and that the two of them made a quick search for the white dress but could not find it. According to her, she was not told that the Lukases were going to the Bedell store. She thought

that the Lukases were in the dress department "maybe 30, 45 minutes," and she did not see them depart. According to her, "We only had one white sheath dress in size 14, the only one in the store." It was that dress that Barbara tried on and which, it is claimed, disappeared. Mrs. Groom testified that before she reported the incident to her superior she had examined the rack from which the white dress was taken and "I would say approximately four" others. Immediately thereafter, according to her, "all the girls got together and we went through everything" in search for the dress. By the term "all the girls" she referred to the six salesladies in the department. Mrs. Turnage, upon receiving the report from Mrs. Groom, went to the first floor where she reported the incident to Mr. Hales. Through quotation from the plaintiff's testimony we have mentioned the plaintiff's version of what then took place.

The Lukases testified that they found a suitable dress in Bedell's and purchased it. Further, they testified that on the afternoon of the day following the unfortunate episode they returned to the dress department of Penney's and found the white dress "right where we put it" the preceding afternoon. The Lukases did not give any impression of the length of time that the incident in the street lasted by estimating it in terms of minutes, but Mr. Hales testified "It couldn't have been over two minutes." The Lukases mentioned incidents and exchanges of words that occurred in the street; from them the jury could have inferred that the incident consumed two minutes or possibly more.

It will be noticed from the testimony which is reviewed in preceding paragraphs that Hales was prompted by a belief that the white dress was in the

shopping bag. He wished to gain control of the bag in order to search its contents. Such being his purpose, he took hold of Barbara's arm and sought to gain access to the shopping bag. He did not take similar hold of the plaintiff, but the latter, being fearful that Hales was about to gain possession of the shopping bag, took it within her grasp. He therefore sought to wrest it from her.

Before accosting the two women Hales did not give them his name nor state that he was an employee of the Penney Company. When Barbara told him that before he could look into the bag he would have to show his "credentials" he replied, "I don't have to show anything." He conceded that he replied to her in those words. Barbara testified that she was fearful that he was some character from the public street. Through the display of physical force Hales made the two Lukases apprehensive of injury. The plaintiff was confronted with the choice of standing her ground, or surrendering her granddaughter and her shopping bag to Hales. Only by abandoning her granddaughter and shopping bag would she be free to go her way. To stand her ground was therefore to abandon her freedom of movement.

We take the following from *Westerman v. Oregon Credit Corp.* 168 Or 216, 122 P2d 435:

"* * * Under these circumstances a mortgagee has no right to employ force against the person of the mortgagor for the purpose of securing possession.

" 'The use of force against another for the purpose of recaption of a chattel, which the other is tortiously witholding from the actor, it not privileged if the other's possession was rightfully acquired.'

"The meaning of this section is clarified by section 117, wherein it is said:

" 'The words "use of force" are used to describe conduct which invades any of another's interest of personality and so is, unless privileged, a "battery," "assault" or "false imprisonment".'

"Specifically, then, the mortgagee may not commit an assault, battery or false imprisonment in the process of taking possession."

■ False imprisonment is the imposition of unlawful restraint upon another's freedom of movement. The restraint need not be for more than a brief time. Restatement of the Law, Torts, § 35. Section 40 of that treatise states:

"Under the rule stated in § 35, the confinement may be by submission to a threat to apply physical force to the other's person or to the person of a member of the other's immediate family immediately upon the other's going or attempting to go beyond the area in which the actor intends to confine him."

The following is taken from 22 Am Jur, False Imprisonment, § 13, page 361:

"The use of force is not necessary to constitute false imprisonment. Any genuine restraint constitutes an actionable imprisonment although effected without actual contact with the person. The essential thing is the restraint of the person. This may be caused by threats, as well as by actual force; and the threats may be by conduct or by words. If the words or conduct are such as to induce a reasonable apprehension of force and the means of coercion are at hand, a person may be as effectually restrained and deprived of liberty, as by prison bars. * * *' "

We quote the following from 35 CJS, False Imprisonment, § 11, page 635:

"The restraint constituting a false imprison-

ment may arise out of words, acts, gestures, or the like which induce a reasonable apprehension that force will be used if plaintiff does not submit, or it is sufficient if they operate on the will of the person threatened and result in a reasonable fear of personal difficulty or personal injuries, and a false imprisonment may be accomplished by threats of injury to person, property, or reputation. * * *"

■ The privilege of examining the shopping bag was the objective of Hales' efforts, but Barbara swore that she and her grandmother did not know that the man who accosted them and took hold of the shopping bag was from Penney's store. We believe that the combination of anger, threats, force, fear and struggle for the shopping bag, all developing suddenly upon the public sidewalk in a public spectacle and involving a grandmother and her granddaughter, were capable of supporting a finding that the defendant restrained the movements of the plaintiff.

We have quoted ORS 164.392 which authorizes a "merchant's employe" if he "has reasonable cause for believing" that a person "has committed the crime of shoplifting" to "detain and interrogate such person in regard thereto in a reasonable manner and for a reasonable time." The defendant concedes that in this case the issue as to "a reasonable manner and for a reasonable time" were for the jury. Hence, we shall not analyze those phases of the evidence. In determining whether Hales' detention of Barbara was privileged under ORS 164.392, we must take into account not only the information that he possessed but also that possessed by Mrs. Groom and Mrs. Turnage. If a "merchant or merchant's employe" wishes to detain some one for questioning he surely should identify himself, especially when, as in this case, the detention

occurred upon a public sidewalk and the individual detained demanded a show of identity. But, let us for the time being brush that aside.

It will be recalled that when the Lukases entered the dress department no clerk was available and, accordingly, they waited upon themselves by taking possession of a fitting room and moving some dresses into it. Presently Mrs. Groom divided her time between them and the customer that she was then serving. She brought them some dresses and then returned to her current customer. The Lukases had brought with them the shopping bag which we have mentioned and which Barbara described as "about twelve inches, thirteen, fourteen inches by sixteen" inches in size. Before long, according to Mrs. Groom, the plaintiff manifested an intention to take the white dress, but when she next returned, the Lukases and the white dress were gone. Only an empty hanger remained. At that juncture Mrs. Groom, so she swore, made a quick search for the dress but failed to find it. She testified that a moment later she and her superior made a search and then all six employees of the department unsuccessfully sought the dress. These are the circumstances to which the defendant points in support of its contention that the three of its employees who were involved in the detention of Barbara acted "with reasonable cause for believing" that an act of shoplifting had occurred.

The detention for a short period of an individual who is connected with a transaction that needs explanation has long been authorized. For example, *Standish v. Narragansett Steamship Company,* 111 Mass 512, 15 Am Rep 66, which was decided in 1873, arose out of the inability of a passenger on the defendant's boat to surrender, as required by the defendant's regulations, his ticket at the end of the trip. The defendant then

detained him, and he claimed that its refusal to permit him to go constituted false imprisonment. In holding that the defendant had a right to detain the plaintiff for a reasonable time while it investigated whether the plaintiff had purchased a ticket, the court ruled:

> "* * * If a passenger should attempt to leave without producing a ticket, and should allege that he had lost it, they would need to investigate the matter, and to ascertain the reason of his conduct, and to make reasonable provision for their own security. The ruling requested that they had no right to detain him, even if he was fraudulently trying to get his passage without a ticket and without paying the fare, was properly refused. The ruling was proper that if the plaintiff lost his ticket it would be his own loss, and not one which the defendants were to bear; and it was sufficiently favorable to the plaintiff to rule 'that they had no right to detain him till he did pay his fare or give up a ticket, or to compel him to pay his fare or give up a ticket; but that if he knew that he was to give up his ticket before leaving the boat, the defendants had a right, if he did not give it up or pay his fare, to detain him for a reasonable time to investigate on the spot the circumstances of his case; and if the jury found that the defendants detained him for the purpose of compelling him to pay his fare or to give up his ticket, or detained him for the purpose of investigating his case for an unreasonable time, or in an unreasonable way, he was entitled to recover.' * * *""

Courts, without the aid of legislation such as ORS 164.392, have recognized the right of a merchant to detain an individual, whom he had reasonable grounds to believe had committed an act of shoplifting in his establishment, for a reasonable period of time while he investigated.

In *Collyer v. S. H. Kress Co.,* 11 Cal2d 170, 54

P2d 20, three employees of the defendant swore that they saw the plaintiff pilfering merchandise from the defendant's stock. He was intercepted at the exit of the store and was escorted into a room for the purpose of investigation. While there he was accused of having stolen merchandise and a demand was made upon him to produce it. Presently he removed from his pockets several items. At the end of half an hour of detention in the office he was incarcerated in the city jail. The trial upon the criminal charge resulted in a verdict of not guilty; and trial upon the charge of false imprisonment brought a verdict in the plaintiff's favor in the sum of $3,500. In reversing that judgment and in disregarding the verdict of not guilty, returned in the criminal case, on the ground that the defendant had probable cause to believe that the plaintiff had stolen merchandise in its store, the decision stated:

> "In an effort to harmonize the individual right to liberty with a reasonable protection to the person or property of the defendant, it should be said in such a charge of false imprisonment, where a defendant had probable cause to believe that the plaintiff was about to injure defendant in his person or property, even though such injury would constitute but a misdemeanor, that probable cause is a defense, provided, of course, that the detention was reasonable. * * * With the foregoing explanation the authorities are harmonized, and it is made clear that probable cause is a justification for the detention of the plaintiff in the instant cause."

The court further held that the issue of probable cause was one of law for determination by the court. Its words were:

> "What is probable cause, as has been often announced, is not a question of fact for the jury, but one of law for the court, to be decided in accordance with the circumstances at the time of the detention,

> unhampered by the outcome of the charge against the plaintiff of the public offense or by the conclusions of the trial court. Davis v. Pacific Tel., etc., Co., 127 Cal. 312, 320, 57 P. 764, 59 P. 698; Mackie v. Ambassador Hotel, etc., Corporation, 123 Cal. App. 215, 11 P.(2d) 3; Allen v. McCoy, 135 Cal.App. 500, 27 P.(2d) 423, 28 P.(2d) 56; Van Fleet v. West American Ins. Co., 5 Cal.App. (2d) 125, 42 P.(2d) 378, 43 P.(2d) 557. * * *"

Although in that case the meeting in the defendant's office in the course of which the plaintiff divulged the stolen property was a stormy one, the decision ruled: "In our opinion, the evidence in that case does not disclose an unreasonable compulsion or detention."

In *Bettolo v. Safeway Stores,* 11 Cal App 2d 430, 54 P2d 24, the plaintiff, while in the defendant's store, placed some groceries into a carrying bag and then was seen to put some candy into his pocket. When he went to the check stand he exhibited the groceries in the carrying bag and paid for them, but two employees who had seen him take the candy and not pay for it followed him to the sidewalk and forced him to return to the store. There he was searched but no candy was found. The candy was shortly discovered among some vegetables at a counter where the plaintiff had stood immediately before leaving the store. The plaintiff, after being detained for ten or twelve minutes, was permitted to leave. The jury returned in his favor a verdict of $1,500 upon a charge of false imprisonment. In reversing the judgment the court stated:

> "The owner of property may, for the purpose of protecting it, restrain, for a reasonable time and for the purpose of investigation, one who he has reason and probable cause for believing has interfered with or stolen it."

It further stated:

> "The undisputed evidence shows reasonable and probable cause for the detention. Johnson had seen the respondent pick up the candy and conceal it in his pocket."

It is unnecessary to take further note of the many decisions which held without the aid of legislation such as ORS 164.392 that a merchant, acting in a reasonable manner, may detain for a reasonable time anyone whom he has probable cause to believe has stolen some of the merchant's goods. The pivotal question in most cases of that character is that of probable cause. In *Gibson v. J. C. Penney Company,* 165 Cal App 2d 640, 331 P2d 1057, the court said:

> "* * * It is well settled that the presence or absence of probable cause is to be determined by the court as a matter of law and not by the jury as a question of fact. Collyer v. S. H. Kress & Co., 5 Cal. 2d 175, 181, 54 P.2d 20; Roberson v. J. C. Penney Co., 136 Cal.App. 2d 1, 4, 288 P.2d 275; 3 U.C.L.A. L Rev. 269; Aitken v. White, 93 Cal.App. 2d 134, 141, 208 P.2d 788. The applicable rule where there is a conflict in the evidence with respect to probable cause is stated in the Aitken case, supra, 93 Cal.App. 2d at page 141, 208 P.2d at page 791, as follows: 'And where, as here, the evidence was in conflict, it was the duty of the court to instruct the jury as to what facts, if established, would constitute probable cause, and only the question as to the existence of such facts should have been submitted to them. [Citation.]' 'The approved method is for the court to instruct the jury that if they find and determine certain questions of fact properly submitted to them to be true or untrue their verdict must be for plaintiff, or for the defendant, as the case may be.' Miller v. Lee, 66 Cal.App. 2d 778, 786, 153 P.2d 190, 195."

A decision which went further in the merchant's behalf than any so far mentioned is *Kroger Grocery and Baking Company v. Waller,* 208 Ark 1063, 189 SW2d 361. Many other decisions are digested and analyzed in Comment, 47 N. W. Univ. Law Rev. 82 and Note 3 U.C.L.A. Calif. Law Rev. 269.

ORS 164.392 authorizes the detention "for a reasonable time" if the "peace officer, merchant or a merchant's employe" has reasonable cause for a belief that the suspected person "has committed the crime of shoplifting." ORS 164.392 requires the detention to be made "in a reasonable manner." Obviously, the detention may be made only for the purpose of investigating the purported crime and not for some other purpose such as to enforce payment or gain a confession.

It will be recalled that the motion made by the defendant for an order directing the jury that the defendant had "reasonable cause to detain and interrogate the plaintiff" acknowledged that there remained for the jury's decision the question "as to whether or not the method and time of detention was reasonable."

We have mentioned that when Hales approached the Lukases he did not identify himself, nor say that he was from the Penney store. Nor did he request the Lukases to return to the store. Barbara, as we have said, testified that she thought he was some intruder from the street. The episode that occurred upon the public sidewalk lasted for approximately two minutes.

In order to sustain its fourth assignment of error the defendant must establish that Hales "had reasonable cause under" ORS 164.392 for a belief that the plaintiff had shoplifted the white dress.

We take the following from *Kraft v. Montgomery Ward & Co., Inc.,* 220 Or 230, 315 P2d 559, 348 P2d 239:

> "Whether the police officer, Sergeant Davenport, had reasonable grounds for belief that the plaintiff, Anton Kraft, was guilty of a felony that would authorize or justify an arrest without a warrant in this case was for the jury to determine, as the facts testified to were in dispute * * *"

The following is quoted from 22 Am Jur § 118, False Imprisonment, page 429:

> "The question of probable cause is a mixed one of law and fact. The court submits the evidence of it to the jury with instructions as to what will amount to probable cause if proved. If the facts were undisputed, the question is one of law to be determined by the court."

In discussing this subject 35 CJS, False Imprisonment, § 59, page 761, says:

> "In general, if the evidence is uncontroverted, the question of reasonable or probable cause for the detention of plaintiff is one of law for the court. If the evidence conflicts, the question of probable cause is a mixed question of law and fact; in that case, the question of the existence of the circumstances relied on as establishing probable cause is one of fact for the jury, under proper instructions from the court, while the question whether the existence of such circumstances would amount to a probable cause is a question of law for the court. * * *"

Under this analysis the jury decides which of the conflicting stories is true, and the judge decides whether this story satisfies the requirements of reasonable cause.

■ And so in this case whether Hales' purported detention of the plaintiff was supported by reasonable

cause was dependent upon the knowledge possessed by Mrs. Groom and Mrs. Turnage. Hales had no information from personal observation of what occurred in the dress department. He was dependent entirely upon what Mrs. Turnage told him; and she, in turn, was largely dependent for her knowledge upon what Mrs. Groom had related to her. Mrs. Groom's testimony concerning her purported search for the dress was not unchallenged. If the Lukases actually returned the dress to the rack, as they swore they did, then one of the following propositions is true: (1) Mrs. Groom's search for the dress may not have met the demands of a reasonably adequate search; (2) Mrs. Groom testified falsely when she swore that she had not found the dress upon the racks after the Lukases had left her department.

In short, the Lukases' testimony that they returned the dress to the rack and saw it there the following day affords the basis for an issue as to whether or not the defendant's employees had "reasonable cause for believing" that the plaintiff was guilty of shoplifting the dress. The motion upon which the defendant's fourth assignment of error is based was properly denied.

We have mentioned the basis of the first and second assignments of error. In view of the fact that the defendant concedes that the question "as to whether or not the method and time of detention was reasonable" was for the jury, we cannot sustain these two assignments of error.

■ The third assignment of error was based upon the refusal of the trial judge to withdraw from the jury's consideration the issue of malice. The motion states that there was "no evidence here of malice sufficient to take the issue of punitive damage to the

jury." We have given a comprehensive statement of the evidence and believe that the third assignment of error must be sustained.

■ The fifth assignment of error is based upon a contention that the defendant did not seek to search anything in the plaintiff's possession. It states: "The bag that was with her was in the possession of her granddaughter." The shopping bag was the only thing which Hales sought to search. It was the property of the plaintiff and her hands were upon it when Hales sought to gain possession of it. She was the one who eventually gave Hales the privilege of looking into the bag. The fifth assignment of error is without merit.

The foregoing disposes of all contentions. The judgment of the circuit court is affirmed with the exception of the sum of $500 punitive damages. That award is reversed and vacated because of the disposition which was made of the third assignment of error.

McALLISTER, Chief Justice, and SLOAN, O'CONNELL, and DENECKE, Justices, concur.

PERRY, J., dissenting.

I am compelled to dissent, because, in my opinion, the facts of the case do not bring the case within the definition of the tort false imprisonment.

The majority state, "False imprisonment is the unlawful restraint upon another's freedom of movement." While this statement is often used to describe the tort of false imprisonment, this definition is far too all-inclusive, unless there is kept in mind the basic element of false imprisonment, an intent to confine.

A person out of anger may assault another and knock him down, thus restricting the other person's freedom of movement, but I do not believe the law

would say the assailant was guilty of false imprisonment, even though the act that caused the restraint from any movement was unlawful. The Restatement of the Law defines false imprisonment as follows:

"(1) An act which, directly or indirectly, is a legal cause of a confinement of another within boundaries fixed by the actor for any time, no matter how short in duration, makes the actor liable to the other irrespective of whether harm is caused to any legally protected interest of the other, if

(a) the act is intended so to confine the other or a third person, and

(b) the other is conscious of the confinement and

(c) the confinement is not consented to by the other, and

(d) the confinement is not otherwise privileged.

(2) An act which is not done with the intention stated in Subsection (1, a) does not make the actor liable to the other for a merely transitory or otherwise harmless confinement, although the act involves an unreasonable risk of imposing it and therefore would be negligent or reckless if the risk threatened bodily harm." 1 Restatement of the Law of Torts, § 35, page 66.

From this statement, it is quite certain that the evidence must disclose an intent to confine, otherwise, while an unlawful act, such as assault and battery, may have been committed, the tort is not that of false imprisonment. As we stated in *Roberts v. Coleman et al,* 228 Or 286 at 293, 365 P2d 79:

"The act must be done with intent to confine and must be the legal cause of confinement. Section 37. The Restatement outlines four possible methods by which confinement may be accomplished, (1) by actual or apparent physical barriers. Section 38; (2) by compulsive physical force

or submission thereto. Section 39; (3) by submission to a threat to apply physical force. Section 40; and (4) by assertion of legal authority. Section 41."

Therefore, it becomes important to determine from the facts of this case whether a reasonable conclusion can be reached that the agent of the defendant intended to confine the plaintiff to a particular area and the plaintiff could, from the actions or words, conclude that such was the agent's intention.

The fact of whether or not there was an intent to confine is to be determined from all of the circumstances which occurred after the defendant's agent learned of the purported theft and after the plaintiff and her granddaughter left the store.

An examination of the statements of the plaintiff and her granddaughter discloses these facts concerning the actions of defendant's agent: (1) He said we had a white dress in that shopping bag; (2) the granddaughter had possession of the shopping bag; (3) he took hold of the granddaughter; (4) the granddaughter told him he would have to show his credentials to see in the bag; (5) he said he didn't have to show "anything"; (6) he took hold of the shopping bag; (7) he got loud and boisterous and plaintiff got afraid he might hit her or the granddaughter; (8) plaintiff then took hold of the shopping bag to keep him from jerking the bag away from the granddaughter; (9) he was so loud and boisterous and plaintiff was embarrassed and getting scared, so she let him look in it.

As stated by the majority, the intention of the defendant's agent was to look into the shopping bag. They state, "What he wished to do was to look inside the bag." The only conclusion that reasonable minds could draw is, therefore, that to accomplish this object,

it might be necessary to detain the possessor of the bag. This was the granddaughter and not the plaintiff. Therefore, if there was any intent to confine anyone for the purposes disclosed by the evidence, it was the possessor of the bag, and, as stated, this was not the plaintiff.

Now, the majority cite the Restatement of the Law of Torts, as follows:

"Under the rule stated in § 35, the confinement may be by submission to a threat to apply physical force to the other's person or to the person of a member of the other's immediate family immediately upon the other's going or attempting to go beyond the area in which the actor intends to confine him." 1 Restatement of the Law of Torts, § 40, page 76.

I am unable to discover any application of this rule of law to the facts in this case. The illustrations 1 and 2 of Section 40, and comments thereon, show the purpose and extent of the rule. I quote:

"1. B, standing at the door some feet away, says to A, 'if you attempt to leave this room, I will knock you down.' B makes no threatening gesture. A, in submission to the threat remains in the room. B has confined A.

"2. A and his child are seated in a room. B, with a revolver in his hand, is standing in close vicinity to A's child. B threatens to shoot A's child if A leaves the room. A in submission to the threat, remains in the room. B has confined A.

"b. The submission must be made to a threat to apply the physical force immediately upon the other's going or attempting to go beyond the area within which the threat is intended to confine him. Submission to the threat to apply physical force at a time appreciably later than that at which the other attempts to go beyond the given area is not

confinement." 1 Restatement of the Law of Torts, § 40, page 76.

There was not one single threat directed against the plaintiff that if she walked away from the scene she would be injured because she left, nor was there the slightest threat that the granddaughter would be injured if the plaintiff left without the agent's permission. In fact, the defendant's agent uttered no threat of violence to anyone if plaintiff wished to leave. The only evidence is that plaintiff drew a conclusion from his "getting so loud and boysterious-like [sic] * * * he might get so mad he might hit one of us because *we wouldn't let him have the shopping bag; * * *.*" (Emphasis mine).

As pointed out by the Restatement, and clearly held in *Roberts v. Coleman,* supra, the force, apart from physical barriers, physical or by threats must refer to the intention to presently confine. There is simply no evidence of this fact in this case.

The facts disclose the plaintiff herself was a voluntary participant in the entire affair. "A mere voluntary remaining in custody * * *" does not constitute false imprisonment. 35 CJS 634, False Imprisonment, § 9.

The majority, to sustain the judgment, must then somehow rely upon the fact that since the plaintiff testified it was her shopping bag she did not remain voluntarily but to protect her shopping bag.

There is not a single iota of evidence that defendant's agent wished to purloin the shopping bag. According to plaintiff's own testimony, he wanted to look in the shopping bag. This does not imply he wished to take, steal, and carry away the bag. The

fact that he grabbed the bag can hardly indicate to the plaintiff, or anyone, an intention to possess permanently the bag, when she herself states she did not think so.

For the above reasons, I would reverse the judgment, with instructions to enter a directed verdict for the defendant.

Mr. Justice GOODWIN joins in this dissent.