Karl KROEGER and H. A. Kroeger, Co-Partners, d/b/a Karl Kroeger Finance Company, Plaintiffs in Error,

v.

Chuck OGSDEN, Defendant in Error.

No. 41546.

Supreme Court of Oklahoma.

June 20, 1967.

Tom J. Lee, Oklahoma City, for plaintiffs in error.

Delmer L. Stagner, Oklahoma City, for defendant in error.

BLACKBIRD, Justice.

This appeal involves an action brought by defendant in error, hereinafter referred to as "plaintiff", for replevin and for damages, and other relief, against plaintiffs in error, hereinafter referred to as "defendants", on account of the latter's alleged conversion of plaintiff's Beechcraft Bonanza Airplane, in purporting to repossess it from him.

In return for some cash and a Cessna Airplane, plaintiff, a farmer and rancher in the Boise City area of Western Oklahoma, acquired the Bonanza in September, 1962 from a Midwest City man, John Harold Wood, who had mortgaged it as security for a promissory note he executed and delivered to one Leo Overture, in July, 1961, for $6,024.00. The defendant, Karl Kroeger Finance Company, acquired the note and mortgage by assignment from Overture. Plaintiff did not have actual notice of said defendants' note and mortgage until Overture defaulted in his payments thereon, and he had received a letter dated March 27, 1963, written for the Finance Company by the defendant Karl Kroeger, stating, among other things, in substance, that when Wood had been contacted the day before, in an effort to make collection, he had "intimated that he had either traded the airplane to you or is negotiating a deal." The letter informed plaintiff that the balance due on Wood's note was $4300.00, including interest on delinquent installments; and further stated: "If you have purchased the airplane please advise me and make some arrangements to retire the balance under Wood's note. I(t) could be entirely possible that we would be agreeable to financing a portion of this balance for you should it become necessary in the consideration of your transaction. * * *."

Thereafter, nothing further having been paid on the above balance, one L. J. Canavan, as agent for defendants, learned by telephoning plaintiff at Boise City that the Bonanza was in a hangar at the Boise City Municipal Airport. Thereafter, the defendant Finance Company's manager, a Mr. Myrick, flew Mr. Canavan and an unnamed individual who was a pilot, to Boise City. There they took possession of the Bonanza and the pilot flew it back to Oklahoma City, where it was sold at a chattel mortgage foreclosure sale on August 10, 1964, to the defendant Karl Kroeger Finance Company for $2600.00, by application and credit on the mortgage indebtedness.

When plaintiff filed his petition in the present action, during August, 1964, he alleged, among other things, in substance, that the Bonanza's motor was started at Boise City airport by wiring around its ignition switch and that the plane's taking and removal from the hangar was without his knowledge or consent, was unlawful, and amounted to a theft of his property. He further alleged that the plane was reasonably worth $7500.00, and prayed for a judgment in that amount, together with his costs and attorneys fees.

In their answer, defendants denied that they had taken possession of the airplane without plaintiff's knowledge, and alleged, among other things, that "on the contrary" they "advised him that they were going to take possession of the plane and requested that he be present if he so desired, at the time of the taking, and * * * plaintiff interposed no objection to the re-possession of the plane by the defendants under their mortgage, * * *".

At the trial, Mr. Canavan, testifying for defendants, stated that, in a long distance call he placed to plaintiff at Boise City, he told him that the Finance Company wanted the plane located and repossessed, and asked plaintiff if he had any objection to his bringing a pilot there and flying the

plane to Oklahoma City; that plaintiff told him he did not; and that he (the witness) made an "arrangement" with plaintiff to meet him "at the airport where the plane was." Canavan further testified that, in one of the long distance telephone conversations he had with plaintiff during the following "week or so", plaintiff asked him to locate the Cessna he had traded in on the Bonanza. This witness further testified that he located the Cessna, made pictures of it, and sent copies of them to plaintiff. Canavan further testified that thereafter, when he and his Oklahoma City companions flew to Boise City and arrived at said City's airport, taking with them a copy of the chattel mortgage on the Bonanza, plaintiff was not there, and they contacted the Sheriff's office. Canavan further testified that he informed one of the Sheriff's deputies of the nature of their mission, showed him the mortgage copy and inquired as to how he might "get a hold of" plaintiff, and the deputy answered: " * * * well, he lives here, farms around here and I don't (know) just how to get a hold of him." Canavan further testified that, at the Boise City airport, he and his Oklahoma City companions found the Bonanza in an open hangar, and identified it by the serial number on the mortgage copy, as the one they were looking for. He further testified that "the plane had the key * * * ('that they turn the ignition on with') * * * sticking in the switch"; that the pilot they brought with them for that purpose, then flew the Bonanza to Oklahoma City, and he (Canavan) flew back to said City with Myrick in the same plane in which they had made the trip to Boise City.

When plaintiff testified, he stated in substance, that he was never apprised, in advance, of defendants' intention to take the plane and that, when it was taken, he was working on his farm, and did not know they had taken it until the night of the day they took it. He admitted that, while he was in Boise City one day previous to the taking, he was called to a long distance telephone at the Ford garage there to take a call from "somebody" in Oklahoma City wanting to know where the plane was based and he told the caller it was at Boise City Municipal Airport. Plaintiff further testified that this was the only time he ever talked to Mr. Canavan, and denied that, in this long distance telephone conversation, he asked Canavan to locate his Cessna. He further testified, in substance, that he didn't have any reason for trying to find out where it was. Plaintiff further testified that the hangar that the Bonanza was in at that time was owned by him; that he had one ignition key to the plane; and that, at the time defendants took the plane, this key was at his residence; that the plane's battery was dead; and that he still has the ignition key in his possession.

After all of the evidence had been introduced, including testimony as to the value of the Bonanza at the time plaintiff purchased it, the cost of improvements he had made on it, and its value when defendants took it, both parties rested; and the trial court entered judgment in plaintiff's favor for possession of the Bonanza, or recovery of its value in the sum of $3500.00, plus costs and interest until paid. The journal entry of said judgment contains the specific finding that the mortgage on the plane was duly and regularly filed with the Federal Aviation Authority (FAA) and that plaintiff was charged with constructive notice of it; but it also contains the finding that the manner in which defendants obtained possession of the plane from plaintiff constituted a conversion of it, and that "by virtue of" said conversion, defendants' mortgage lien on the plane was extinguished; and the judgment so decreed.

In connection with its alternative judgment in plaintiff's favor for possession of the plane, the court decreed that if defendants redelivered it, plaintiff will be entitled to damages for depreciation "in such amount as he shall show himself entitled and that this court retains jurisdiction of this cause for the purpose of determining such damages or any issue as to apprecia-

tion upon the motion of the plaintiff therefor, * * * ".

Relative to the issue of conversion, the trial court's judgment made the following findings of fact:

"* * * *

"2. That a bona fide dispute arose between the parties as to the validity of the lien of the defendants and upon defendants' demand for possession of the airplane the plaintiff refused to give such possession.

"3. That the agents of the defendants ascertained the location of the airplane from the plaintiff and without his permission they went upon his private property and removed the airplane without his knowledge and flew it from the airport in Boise City, Oklahoma, to Oklahoma City, Oklahoma.

"4. That the defendants obtained possession of the airplane by stealth and by trespassing upon the private property of the plaintiff and such taking was wrongful and constituted a conversion of the airplane. * * *."

Thereafter, defendants filed a motion for a new trial on the ground of newly discovered evidence, with an affidavit attached; and plaintiff filed a response thereto with affidavits attached. After the motion for a new trial was overruled, defendants lodged the present appeal.

For reversal of the trial court's judgment, defendants urge two propositions, the first of which is:

"The trial court erred in holding that the defendants unlawfully took possession of the air craft which thereby constituted a conversion of the plane and the extinguishment of their mortgage."

To support their position that the trial court erred in holding that the manner in which they obtained the Bonanza from the Boise City airport constituted a conversion, defendants argue, in essence, that their taking of the plane was not unlawful, because it caused no breach of the peace and was authorized both by law and the provi-

sions of the chattel mortgage. They infer that their agents' going into the hangar and taking the plane out of it could not have been a trespass (even if the hangar belonged to plaintiff, as distinguished from being public domain, or property) because the provisions of the chattel mortgage specifically authorized the mortgagee, in the event of default of payments on the note "* * * to enter upon the premises where said goods and chattels may be, and remove by repelvin or otherwise, and sell the same, * * *". Defendants argue that our statutes and decisions make it lawful for the holder of a chattel mortgage in such a situation, to take possession of the mortgaged property if this can be done in an orderly manner and without a breach of the peace. Defendants also cite the provisions of the Uniform Commercial Code adopted in this State as Tit. 12A O.S.1961, § 9–503 and quotations from Malone v. Darr, 178 Okl. 443, 62 P.2d 1254; First National Bank and Trust Company of Muskogee v. Winter, 176 Okl. 400, 55 P.2d 1029; Leedy v. General Motors Acceptance Corp., 173 Okl. 445, 48 P.2d 1074, and other cases.

The Leedy Case, supra, recognizes that the holder of a chattel mortgage may not resort to stealth to obtain possession of the mortgaged chattel, as does Murrell v. Griswold, Okl., 338 P.2d 150, also cited by defendants.

Plaintiff's answer brief denies the applicability of § 9–503, supra, on the ground that the Uniform Commercial Code had not become effective in this State at the time the Subject chattel mortgage was executed and delivered; and they argue that since plaintiff was not the mortgagor, he cannot be regarded as having authorized the mortgagee, or his assignee Finance Company— by the provisions of the mortgage—to enter upon any premises where the plane might be found and remove it, without legal process.

A patent weakness in the latter argument is that it finds no fault with the trial court's finding that plaintiff had constructive notice of the chattel mortgage on the plane,

at the time he purchased it; and no effort is made, nor authority cited, to show that all of its provisions were not as thoroughly binding upon plaintiff, as they were upon Wood, the mortgagor.

Another weakness in plaintiff's position is that he does not effectively demonstrate, and we fail to find in the record any conduct on the part of the defendants that has been held to constitute, "stealth", or "trespass", within the meaning of those terms as used in cases of this kind.

As far as the record shows, defendants were guilty of no overt act of stealth, deception, or fraud previous to their finding of the Bonanza in the open hangar at the Boise City Municipal Airport; and there is no direct evidence to support the trial court's finding (no. "2") that plaintiff ever refused, or was even reluctant, to give defendants possession of it. On the contrary, the only reasonable conclusion to be drawn from plaintiff's testimony as to (what he said was) the only telephone conversation he ever had with any of the defendants, was that he was never even asked for possession of the plane. While there is no evidence that plaintiff ever answered Karl Kroeger's hereinbefore mentioned letter of March 27, 1963, and, as far as the record shows, he ignored the suggestions, therein made, relative to re-financing or defraying the mortgage indebtedness on the plane, this circumstance, as a fact, falls far short of establishing the facts of a "bona fide dispute" between him and the defendants, and of a demand for the plane by them, and a refusal of such demand by him. Nor does the conflicting evidence testimony of Canavan about the more than one telephone conversation he had with plaintiff—or any other evidence we have been able to discover in the record—support this finding of dispute, demand, and refusal.

Appellate court reports are replete with cases in which the holders of chattel mortgages, or conditional sales contracts, have, upon default in the payment of the indebtedness on the chattel covered thereby, taken possession of it, unbeknownst at that time to the obligor, without being held to have committed conversion, even when the chattel was taken from the obligor's private premises. See Gill v. Mercantile Trust Co., Mo.App., 347 S.W.2d 420; Rea v. Universal C.I.T. Credit Corporation, 257 N.C. 639, 127 S.E.2d 225; Morrison v. Gaylon Motor Co., 16 Tenn.App. 394, 64 S.W.2d 851, and other cases cited and discussed in the Annotation at 99 A.L.R.2d 358, 385, et seq. From our research we have concluded that, in most jurisdictions—even those in which a chattel mortgage vests in the mortgagee only a lien on the mortgaged property (as distinguished from title to it)—it is held that where the mortgage provisions authorize the mortgagee, in the event of the mortgagor's default, to exercise the option, without notice, of foreclosing the mortgage and entering upon the premises where the mortgaged chattel may be, to remove it, this gives the mortgagee a right, practically amounting to a license, to go upon the mortgagor's private premises for that purpose, if this can be done in an orderly manner and without a breach of the peace. If the mortgagee does this as a licensee, then, of course, he would not be a trespasser; and, if his assignee succeeds to all of his rights under the mortgage, then it may also do the same thing, without becoming a trespasser. Westerman v. Oregon Automobile Credit Corp., 168 Or. 216, 122 P.2d 435, contains an excellent analysis and résumé of judicial opinions in this Nation on the subject, up to the time of its promulgation; and, as therein indicated, this Court's previous opinions, notably First National Bank and Trust Company of Muskogee v. Winter, supra, align it with the majority of other appellate courts, notwithstanding the fact—recognized in Malone v. Darr, supra—that this is a "lien", rather than a "title" state. In Carey v. Interstate Bond & Mortgage Co., 4 Wash.2d 632, 104 P.2d 579, also decided in a "lien" state, it did not appear that the mortgagee took possession of the mortgaged chattels for the purpose of any statutory foreclosure process. It should be recognized that, under the facts of this case,

there is no occasion, or necessity for expressing any opinion as to whether, or not plaintiff—had he been present at the Boise City Airport when defendants' agents were there to take the plane—could have effectively revoked the license granted in the mortgage. It is indicated that the Appellate Court of Louisiana may not subscribe to the majority views of the license granted the mortgagee, or his assignee, by such a provision of the mortgage agreement; but that State has a statute limiting the effect of such agreements. In this connection, see Price v. General Motors Acceptance Corp., La.App., 95 So.2d 834, and Victor v. Fairchild Motor Corp., La.App., 8 So.2d 566 and the latter's quotation (p. 568) from Bettis v. Singer Sewing Machine Co., 10 Orleans App. 273, as well as the discussion of Van Wren v. Flynn, 34 La.Ann. 1158, and Jenks v. Howe Sewing Machine Co., 34 La.Ann. 1241, in the Annotations at 55 A.L.R. 184, 185, and 146 A.L.R. 1331, 1343.

■ As hereinbefore indicated, plaintiff testified that he owned the hangar in which the Bonanza was located at the time defendants' agents took possession of it (although it appears probable that it was on land acquired by Boise City for its Municipal Airport) but the evidence was to the effect that it was "open" (or without doors or walls) on one or two sides, so that no "breaking and entering" in any tangible sense of the term was necessary, or involved, in gaining entry to the hangar. If plaintiff had been there at the time, and had refused to allow them on the premises, then, under the decisions of some courts, they might have been guilty of trespass, and/or conduct calculated to provoke a breach of peace, if they had persisted (see C.I.T. Corp. v. Brewer, 146 Fla. 247, 200 So. 910 and Morrison v. Gaylon Motor Co., supra.); but, as already shown, this was not the case. Nor is there any evidence that, in starting the Bonanza's motor, it was necessary to "break into" it, or damage it, as the undisputed evidence of Mr. Canavan was that the plane's "righthand door * * * cannot be closed, * * *". There

is no direct evidence that, in order to start the plane's motor, defendants' agents had to wire around the ignition switch (as alleged in plaintiff's petition) and any conclusion that this was done, must be deduced solely from plaintiff's testimony (inferentially contradicted) to the effect that the plane's (one) ignition key was then at his home. Assuming, however, that the wiring-around process was the way that the plane's motor was started, there is no evidence that defendants' use of this mode of starting the motor damaged the plane in any way (in this connection, notice Commercial Credit Co. v. Spence, 185 Miss. 293, 184 So. 439, 441, citing Roberts v. International Harvester Co., 181 Miss. 440, 180 So. 747); and, in view of other modes of gaining dominion over chattels being repossessed, that this court, and others, have accepted as lawful, without adverse ruling, or comment (see, for instance, Malone v. Darr and Rea v. Universal C.I.T. Credit Corporation, supra), we are not prepared to hold that the defendants obtained possession of the Bonanza, as the trial court found, in a manner that constituted conversion, either on account of their trespass (see 13 Am.Jur. 2d "Chattel Mortgages", § 122, Notes 12 and 13) or stealth. We therefore hold that in so finding, said court erred. If, before the repossession, the mortgage lien was binding upon plaintiff, as the trial court's finding that he had constructive notice of it, would ordinarily indicate, we think that holding it extinguished, on the ground of conversion, under the circumstances of this case, would be (to use the words of the North Carolina Court in the Rea Case, supra) "a fraud on the rights of the mortgagee (in this case, his assignee) and would very much impair the value of chattel mortgages as securities." As the trial court's judgment has no express and valid basis, in the face of its error, and must therefore be reversed, it is unnecessary to discuss other assignments of error.

In accord with the foregoing, the judgment of the trial court is hereby reversed insofar as it decrees recovery by plaintiff

against the defendants of the sum of $3500.00, costs, and interest, or possession of the Beech Bonanza Airplane involved, and this cause is remanded to said court free of defendants' chattel mortgage lien; with instructions to vacate said judgment, as to such recovery, and to enter a new judgment in favor of the defendants on the issues therein initially adjudicated. As to any proper issues not determined by said judgment and this opinion and reserved by the trial court for future determination, we express no opinion.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON, HODGES, LAVENDER and McINERNEY, JJ., concur.

WILLIAMS, J., dissents.