**Manual de J. GOMEZ et al., Appellants,**

v.

**Jerry V. WILSON, Chief of Police, et al., Appellees.**

**No. 71–1484.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 1972.

Decided March 23, 1973.

Nancy Pyeatt, Washington, D. C., with whom Ralph J. Temple, Washington, D. C., was on the brief, for appellants.

David P. Sutton, Asst. Corp. Counsel, C. Francis Murphy, Corp. Counsel, District of Columbia, Richard W. Barton, Asst. Corp. Counsel, were on the brief, for appellees.

Before BAZELON, Chief Judge and McGOWAN and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

For the third time in four years we are confronted with an appeal in litigation commenced more than five years ago to prevent District of Columbia police from interfering with appellant's nocturnal strolls on public thoroughfares in the city.[1] Now for the third time, we are compelled to adjudicate the appeal without achieving a full resolution of appellant's grievances on the merits. And for the third time we find that we must remand the case to the District Court to enable further proceedings there.

I

Appellant's lengthy odyssey through the courts was precipitated in 1967 when he was twice stopped and questioned by police officers while walking in the vicinity of Dupont Circle late at night. On both occasions the officers filled out so-called vagrancy observation forms[2] and informed appellant that if he was further observed in the area he would become subject to arrest.[3] Appellant sought legal advice and subsequently commenced suit in the District Court for declaratory and injunctive relief. He sought specifically a declaration of his right to walk or be in public places while sober and well-behaved, and an injunction restraining police intrusion upon that right. He also sought expunction from police records of the vagrancy

---

1. Our earlier decisions in this case are Gomez v. Layton, 129 U.S.App.D.C. 289, 394 F.2d 764 (1968), and Gomez v. Wilson, 139 U.S.App.D.C. 122, 430 F.2d 495 (1970).

2. See Hall v. United States, 148 U.S.App. D.C. 42, 48-49, 459 F.2d 831, 837-838 (en banc 1972); Ricks v. District of Columbia (*Ricks I*), 134 U.S.App.D.C. 201, 212-214, 414 F.2d 1097, 1108-1110 (1968); Ricks v. United States (*Ricks II*), 134 U.S.App.D.C. 215, 219-220, 414 F.2d 1111, 1115-1116 (1968).

3. A more detailed account of appellant's two encounters with the police is found in the District Court's opinion on the second remand, Gomez v. Wilson, 323 F. Supp. 87, 92 (D.D.C.1971).

observations which had been made and a declaration that the District's general vagrancy statute [4] was unconstitutional in toto.

The District Court, *sua sponte*, dismissed the action on several grounds. On the first appeal, we vacated the dismissal and remanded to the District Court for further proceedings.[5] On the remand, the District Court again dismissed on the ground that the case was rendered moot by our intervening decision in Ricks v. District of Columbia (*Ricks I*),[6] wherein we held three subsections of the general vagrancy law unconstitutionally vague, and by the discontinuance of police observations under the impugned subsections in response to that decision.[7] On the second appeal, we vacated that dismissal and remanded for the proceedings we had envisioned on the first.[8]

■ The case was then heard on the merits, and appellant was awarded a part of the relief sought in his complaint. The District Court's order enjoins the police from interfering with appellant's right to walk or be in any place in the District of Columbia while sober and well-behaved, and requires elimination from police records of all references to the vagrancy observations made of him.[9] Since there is no appeal from so much of the District Court's action, we have no occasion to examine its propriety.[10] Appellant now attacks the court's order because in some respects the relief it afforded fell short of the goals set by his complaint.

Two errors are alleged: first, that the District Court should have treated the case as a class action and granted relief accordingly; and second, that the court should have held unconstitutional the subsections of the vagrancy statute which were not in issue in *Ricks I*. For reasons now to be stated, we are unable to decide either of these questions, but instead must remand the case to the District Court once again.

## II

In the five years which have elapsed since this litigation began, both the law and police policies governing on-the-street stopping and questioning of citizens have undergone substantial modification. *Ricks I* invalidated portions of the District's general vagrancy statute [11] and its companion, Ricks v. United States (*Ricks II*),[12] portions of the Dis-

---

4. D.C.Code §§ 22–3302 to 22–3306 (1967). This statute is to be distinguished from the District's narcotic vagrancy law, D.C. Code § 33–416a (1967).

5. Gomez v. Layton, *supra* note 1, 129 U.S. App.D.C. at 291, 394 F.2d at 766.

6. *Supra* note 2.

7. Only subsections (1), (3), and (8) of D.C.Code § 22–3302 (1967) were declared invalid. 134 U.S.App.D.C. at 214, 414 F.2d at 1110. Subsection (2) had previously been repealed. Act of June 29, 1953, ch. 159, § 209, 67 Stat. 97. This left subsections (4), (5), (6), (7), and (9) still standing.

8. Gomez v. Wilson, *supra* note 1, 139 U.S. App.D.C. at 125, 430 F.2d at 498.

9. Gomez v. Wilson, *supra* note 3, 323 F. Supp. at 93.

10. Appellees do not cross-appeal the injunction against them or the direction that the vagrancy observations be ex-

punged. These unappealed portions of the District Court's order have thus become final, and we are without jurisdiction to reconsider them. Fed.R.App.P. 4(a); Hodgson v. United Mine Workers, 153 U.S.App.D.C. 407, at 413, 473 F.2d 118 at 124 (1972); Weedon v. Gaden, 136 U.S. App.D.C. 1, 5, 419 F.2d 303, 307 (1969); Lord v. Helmandollar, 121 U.S.App.D.C. 168, 170, 348 F.2d 780, 782 (1965), cert. denied, 383 U.S. 928, 86 S.Ct. 929, 15 L.Ed.2d 847 (1966). Consequently, we have no occasion to probe the validity of the District Court's decision on those aspects of the litigation, or the factual findings or legal conclusions underlying it. But see separate opinion, *post* pp. 423–424 et seq. So much of the court's decision, right or wrong, is now impregnable, and for our purposes we fully accept it as such.

11. See note 7, *supra*.

12. *Supra* note 2.

trict's narcotic vagrancy statute.[13] Since these decisions, a plethora of police regulations pertaining to street investigations have been issued.[14] Among them are traffic and pedestrian "spot check" procedures, which appellant contends are merely the old vagrancy observation measures in new guise.[15]

In May, 1968, the Supreme Court addressed the problems raised by police investigatory stops and accompanying searches in Terry v. Ohio [16] and related cases,[17] and established standards to harmonize on-street inquiries and protective frisks with the Fourth Amendment.[18] In response to *Terry*, the Metropolitan Police Department has is-

sued a nine-page set of guidelines to assist its officers in complying with the constitutionally-mandated requirements.[19] And more recently this court, in Hall v. United States [20] and Long v. District of Columbia,[21] has dealt with claims of unlawful police interference with the prerogatives of citizens to carry on their activities in public places undisturbed.[22]

■■ It is against this backdrop of changing law and practice that appellant has here renewed his request for class-action relief and a declaration of unconstitutionality of the remaining sections of the general vagrancy statute. But the record before us is bottomed solely

13. 134 U.S.App.D.C. at 217, 414 F.2d at 1113.

14. These include (a) a memorandum dated February 17, 1969, from the Chief of Police to members of the force, which discontinued vagrancy observations and arrests in certain instances but condoned the practice of questioning and reporting on "persons engaged in suspicious activity;" (b) a memorandum dated December 19, 1969, to Second District police regarding utilization of a traffic check system to stop and report on motorists "in suspicious circumstances;" (c) a memorandum dated January 13, 1970, to Second District officers regarding utilization of the traffic check procedures to stop "suspicious persons on foot;" and (d) a memorandum dated June 12, 1970, to Second District police regarding utilization of a form to record observations of vehicles and "all suspicious persons found loitering about this area."

15. The "spot check" form is to be filled out on all suspicious vehicles and persons with such information as the location, date and time of the observation and the name, address and description of the individual observed. The vehicular spot check was sustained in Palmore v. United States, 290 A.2d 573, 580–584 (D.C. App.1972), but that case is now undergoing review by the Supreme Court. 409 U.S. 840, 93 S.Ct. 66, 35 L.Ed.2d 79, 41 U.S.L.W. 3158, 3183, 3429, 3456.

16. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

17. Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Peters v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). See also

Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

18. Terry v. Ohio, *supra* note 16, 392 U.S. at 20–27, 88 S.Ct. 1868; Adams v. Williams, *supra* note 17, 407 U.S. at 145–156, 92 S.Ct. 1921.

19. In describing these guidelines in Long v. District of Columbia, 152 U.S.App. D.C. 187, 469 F.2d 927 (1972), the court said:

> The guidelines provide that in order to stop an individual an officer must have a "reasonable suspicion" that the person is committing, has committed, or is about to commit any felony or misdemeanor prosecutable by the U.S. Attorney. . . . The procedures stress that stops should not be used to harass citizens and there are a number of limitations designed to curb the use of investigatory stops.

*Id.* at 931.

20. *Supra* note 2.

21. *Supra* note 19.

22. In *Hall*, we reversed a conviction predicated on possession of narcotics seized upon the accused's arrest under one of the subsections of the District of Columbia narcotic vagrancy statute, D.C. Code § 33–416a (1967), which had been held unconstitutionally vague in *Ricks II*, *supra* note 2, because conduct ostensibly within the purview of that subsection does not ipso facto establish probable cause for the arrest. In *Long*, we affirmed a District Judge's refusal to convene a three-judge court, and his dismissal of a constitutional challenge to D.C.Code § 4–140a (Supp. IV 1971) and 18 U.S.C. § 3501 (a)–(c) (1970), which stemmed from a stop and frisk in a jewelry store.

on two incidents which occurred more than five years ago in the milieu of legislative and administrative policy of that day. Given the massive developments intervening since appellant experienced the difficulties alleged in his complaint, we cannot base the determinations he seeks on such a thin foundation. Two episodes of such vintage hardly generate, simply on their own, a realistic prospect of future repetition, either as to appellant or others. Quite plainly, they do not suffice as a predicate for an injunction in favor of a class.[23] Even more speculative, in view of current police practices claiming newer sources of authorization, is any potential link between the general vagrancy statute and any further difficulties which appellant or others may encounter. Neither the District Court nor this court is at liberty to decide constitutional questions posed hypothetically.[24] Such decisions, rather, are to be rested upon a record which supplies factual support far more adequately than the one now before us does.[25]

■ Nevertheless, in the midst of all the change in the law and its implementation by police, one circumstance allegedly remains unaltered. Appellant asserts that he is still a target of police harassment while taking his walks at night. At oral argument his counsel informed us that *since* the District Court issued its last order, there have been two occasions on which he was stopped and interrogated by police,[26] and that on at least one of these a written notation of the incident was made by the officers.[27] In support of his plea for a greater measure of relief than he was awarded in the District Court, appellant has presented to this court a third-party affidavit alleging that other citizens have been subjected in recent months to detention and questioning on the streets.[28] On the heels of these charges is a disturbing concession by appellees' counsel that the present police spot-check procedures permit citizens to be halted and quizzed even in circumstances under which *Terry* does not purport to authorize intrusion.

■ Since this new information was brought to light after this case had left the District Court, it is outside the record on appeal. We think, however, that it constitutes enough of a showing to entitle appellant to an opportunity to update his lawsuit as a predicate for possible further relief. As a part of our appellate jurisdiction, we are empowered to "remand the cause and . . . require such further proceedings to be had as may be just under the circumstan-

23. Long v. District of Columbia, *supra* note 19, 469 F.2d at 932, 934.

24. *E. g.*, Thorpe v. Housing Authority, 393 U.S. 268, 284, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) ; United States v. Raines, 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) ; Longshoremen's Int'l v. Boyd, 347 U.S. 222, 224, 74 S.Ct. 447, 98 L.Ed. 650 (1948) ; United Pub. Workers v. Mitchell, 330 U.S. 75, 90, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

25. United States v. Petrillo, 332 U.S. 1, 12, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947) ; Borden's Farm Prods. Co. v. Baldwin, 293 U.S. 194, 210–213, 55 S.Ct. 187, 79 L.Ed. 281 (1934) ; City of Hammond v. Schappi Bus Line, 275 U.S. 164, 171–172, 48 S.Ct. 66, 72 L.Ed. 218 (1927) ; Chastleton Corp. v. Sinclair, 264 U.S. 543, 548–549, 44 S.Ct. 405, 68 L.Ed. 841 (1924)

26. These incidents are claimed to have taken place on June 8, 1972, and in August, 1972.

27. Appellant alleges that on June 8, 1972, one of the officers wrote something on a card during their conversation with him.

28. And, exercising our authority to judicially notice the record in other litigation in this court, see Craemer v. Washington, 168 U.S. 124, 129, 18 S.Ct. 1, 42 L.Ed. 407 (1898) ; Butler v. Eaton, 141 U.S. 240, 243–243, 11 S.Ct. 985, 35 L.Ed. 713 (1891) ; Zahn v. Transamerica Corp., 162 F.2d 36, 48 n. 20 (3d Cir. 1947), we have scrutinized affidavits of still other citizens recounting similar experiences. Appellant's Petition for Rehearing and Suggestion for Rehearing *En Banc*, at 415, Long v. District of Columbia, *supra* note 19.

ces." [29] This broad authorization clearly encompasses remands for the purpose of renovating the pleadings [30] and taking additional evidence; [31] and, once appellant is again in the District Court, he will be free to appropriately supplement his complaint.[32] That may include allegation of recent incidents,[33] joinder of additional parties [34] and, of course, presentation of such legal contentions as may be indicated. After suitable response by appellees,[35] the District Court will be in position to hear any meritorious claims forthcoming, and to expeditiously resolve them—individually or as a class—on a concrete basis.

We are mindful of the hardships imposed on parties where, as here, the wheels of justice grind so slowly that they may appear to hardly turn at all. Justice that is both swift and sure is the millennium and must remain increasingly the goal of us all. Yet it sometimes happens, however regrettably, that speed in adjudication must to some extent yield to quality of adjudication. The case before us demands such a yielding to enable a sound evaluation of appel-

29. 28 U.S.C. § 2106 (1970).

30. See Wells Fargo & Co. v. Taylor, 254 U.S. 175, 182, 41 S.Ct. 93, 65 L.Ed. 205 (1920) ; Rogers v. Lion Transfer & Storage Co., 120 U.S.App.D.C. 186, 187, 345 F.2d 80, 81 (1965) ; Mauro v. Packard Motor Car Co., 215 F.2d 590, 592 (3d Cir. 1954) ; Routzahn v. Brown, 95 F.2d 766, 769 (6th Cir. 1938) ; United States Cartridge Co. v. Powell, 186 F.2d 611, 614 (8th Cir.), cert. denied, 341 U.S. 936, 71 S.Ct. 855, 95 L.Ed. 1364 (1951).

31. See Byrd v. Blue Ridge Rural Elec. Co-operative, 356 U.S. 525, 540, 78 S.Ct. 893, 2 L.Ed.2d 953 (1968) ; United States v. Shotwell Mfg. Co., 355 U.S. 233, 243, 78 S.Ct. 245, 2 L.Ed.2d 234 (1957) ; Willing v. Binenstock, 302 U.S. 272, 277, 58 S.Ct. 175, 82 L.Ed. 248 (1937) ; Rogers v. Lion Transfer & Storage Co., *supra* note 30, 120 U.S.App.D.C. at 187, 345 F.2d at 81; Alabama Polytechnic Institute v. District of Columbia, 102 U.S. App.D.C. 83, 86, 250 F.2d 408, 411 (1957).

32. "Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense. If the court deems it advisable that the adverse party plead to the supplemental pleading, it shall so order, specifying the time therefor." Fed.R.Civ.P. 15(d).

33. *E. g.*, McHenry v. Ford Motor Co., 269 F.2d 18, 25 (6th Cir. 1959) ; Howard v. Jennings, 141 F.2d 193, 195 (8th Cir. 1944) ; Schempp v. School Dist. of Abington Township, 195 F.Supp. 518, 519 (E.D.Pa.1961).

34. *E. g.*, Griffin v. County School Bd., 377 U.S. 218, 226–227, 84 S.Ct. 1226, 12 L.Ed. 2d 256 (1964) ; United States v. National Screen Serv. Corp., 20 F.R.D. 226, 227–228 (S.D.N.Y.1957).

Griffin v. County School Bd., *supra*, is especially instructive. The school board was one of four involved in the decision in Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), wherein the Court held state-imposed racial segregation in public schools unconstitutional and directed the issuance of orders requiring the admission of students to such schools on a racially nondiscriminatory basis. The school board, however, closed the county's public schools and refused to reopen them, and participated in a plan assisting attendance at private schools operated for white children only. A supplemental complaint was thereafter filed in the original action charging use of state funds to support segregated schools and seeking an injunction compelling the reopening of the public schools. In sustaining the propriety of that procedure, the Court said :

> Rule 15(d) of the Federal Rules . . . plainly permits supplemental amendments to cover events happening after suit, and it follows, of course, that persons participating in these new events may be added if necessary. Such amendments are well within the basic aim of the rules to make pleadings a means to achieve an orderly and fair administration of justice.

377 U.S. at 227, 84 S.Ct. at 1231.

35. See note 32, *supra*. See also United States v. L. D. Caulk Co., 114 F.Supp. 939, 941 (D.Del.1952) ; Ebel v. Drum, 55 F.Supp. 186, 188 (D.Mass.1944) ; Slavenburg Corp. v. Boston Ins. Co., 30 F.R.D. 123, 126 (S.D.N.Y.1962) ; Kraushaar v. Leschin, 4 F.R.D. 144, 145 (E.D. Pa.1944).

lant's contentions in the context of current police investigatory methods and their precise impact upon him and others. To that end we must remand the case to the District Court for further proceedings. Of course, it is for appellant to determine the tactical course he wishes to pursue, and we intimate no view on the merits of any controversy ensuing.[36]

### III

One other aspect of this litigation merits discussion. The power of the District Court to entertain appellant's suit has not been challenged, but the jurisdictional foundation upon which the court proceeded is unclear. Of three bases averred in appellant's complaint,[37]

one is inefficacious,[38] another is unsustained[39] and the third, though serviceable in this litigation, is no longer available to would-be litigants.[40] The record contains no express jurisdictional determination nor does it indicate that, beyond the jurisdictional grounds alleged in the complaint and contested in appellees' answer, the parties have addressed the question. Since the jurisdiction of a federal court is an ever-present concern,[41] the problem deserves more attention than it has received.[42]

■ We put aside at once appellant's claim of jurisdiction under 28 U.S.C. § 1343(3).[43] Evidently appellant has theorized that the incidents he complained of gave rise to a cause of action under 42 U.S.C. § 1983[44] which was cog-

---

36. The separate opinion, *post* pp. 425–426 et seq. While agreeing that a remand is necessary, asserts that we should facilitate the completion of this litigation by offering guidance to the District Court. Because we do not adopt the exposition the opinion makes, it accuses us of impairing the credibility of the court. The only substantial "guidance" which the opinion volunteers, however, consists of a discussion of the feasibility of a preliminary injunction against spot checks pending conclusion of the remand. We would not presume to instruct experienced counsel or a trial judge more than thirty years on the bench as to the well known criteria for granting such injunctions.

Moreover, appellant already has a permanent injunction affording him individually every bit of the protection asked in his complaint, and obviously has also the prerogative of charging any violation of that injunction as a contempt of court. To be sure, a preliminary injunction, if granted, would ban spot checks temporarily while the proceedings continue, but it would not bring about the ultimate determination on the merits any sooner. Nor, despite the substantial amount of "guidance" proffered, do we find any suggestion in the separate opinion that would shorten the dispositional process one whit. We cannot imagine a more serious threat to the court's credibility than a promise that hardly could be fulfilled.

37. The complaint invoked jurisdiction pursuant to 28 U.S.C. §§ 1331(a), 1343(3) (1970), and D.C.Code § 11–521(a)(1) (1967).

38. See text *infra* at notes 43–46.

39. See text *infra* at notes 45–57.

40. See text *infra* at notes 58–70.

41. *E. g.*, McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); Louisville & N. R.R. v. Mottley, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908); King Bridge Co. v. Otoe County, 120 U.S. 225, 226, 7 S.Ct. 552, 30 L.Ed. 623 (1887); Mansfield, C. & L. M. Ry. v. Swan, 111 U.S. 379, 382–383 (1884).

42. Since each of the two previous appeals in this case was from a pretrial dismissal of the action by the District Court, see text *supra* at notes 5–8, we have had no previous call to scrutinize the District Court's jurisdiction.

43. "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . . [t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States. . . ." 28 U.S.C. § 1343(3) (1970).

44. "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation

nizable in the District Court by virtue of Section 1343(3). But very recently, in District of Columbia v. Carter,[45] the Supreme Court held that no right to sue under Section 1983 is generated by action of the District of Columbia or its representatives. Our reading of *Carter* in light of the common origin and objectives of the two sections convinces us that Section 1343(3) does not furnish a federal forum for the case at bar.[46]

We look next to 28 U.S.C. § 1331(a) —the general federal-question provision —which vests in the district courts jurisdiction of civil actions in which the matter in controversy "arises under the Constitution, laws, or treaties of the United States" and exceeds $10,000 in principal "sum or value." [47] We are satisfied that appellant's complaint spelled out a controversy arising under the Constitution,[48] and consequently that Section 1331(a) conferred jurisdiction if the required amount were involved.[49] Our difficulty, however, is that on the record before us we cannot be sure that the amount prerequisite was really at stake. To be sure, appellant formally alleged that the amount in controversy exceeded the statutory minimum, but appellees denied that allegation in their answer and the matter was dropped at that point. The record is barren of any further effort by the parties to either establish or disestablish this jurisdictional element, and of any determination by the District Court on that score.

Where the call for federal-question jurisdiction under Section 1331(a) is meritorious, the task of dem-

---

of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983 (1970).

45. 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (U.S.1973).

46. *Id.* at 4131.

47. "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a) (1970).

48. Appellant's claim invoked the Fourth Amendment's safeguard against unreasonable seizures of the person, *e. g.*, Terry v. Ohio, *supra* note 16, 392 U.S. at 8–9, 88 S.Ct. 1868, and the Fifth's protection against deprivation of liberty of movement without due process of law, *e. g.*, Shuttlesworth v. City of Birmingham, 382 U.S. 87, 90, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965).

49. The Supreme Court has admonished that "in suits against federal officers for alleged deprivations of constitutional rights, it is necessary to satisfy the amount-in-controversy requirement for federal jurisdiction." Lynch v. Household Finance Corp., 405 U.S. 538, 547, 92 S.Ct. 1113, 1119, 31 L.Ed.2d 424 (1971). The federal courts have for the most part adhered to this rule. See Wolff v. Selective Serv. Local Bd. No. 16, 372 F.2d 817, 826 (2d Cir. 1967) ; Spock v. David, 469 F.2d 1047 (3d Cir. 1972), at 8; McGaw v. Farrow, 472 F.2d 952 (4th Cir. 1973), at 6; Goldsmith v. Sutherland, 426 F.2d 1395, 1397 (6th Cir.), cert. denied, 400 U.S. 960, 91 S.Ct. 353, 27 L.Ed.2d 270 (1970) ; Giancana v. Johnson, 335 F.2d 366, 369 (7th Cir. 1964), cert. denied, 379 U.S. 1001, 85 S.Ct. 718, 13 L.Ed.2d 702 (1965) ; Stinson v. Finch, 317 F.Supp. 581, 586 (N.D.Ga.1970) ; Boyd v. Clark, 287 F. Supp. 561, 564 (S.D.N.Y.1968), aff'd without reaching the jurisdictional question under § 1331(a), 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969).

No difference in principle results merely from the fact that appellant's suit was against District officials since no more for that suit than for one against federal officers was there general federal jurisdiction in the circumstances presented.

The need to meet the jurisdictional amount requirement in § 1331(a) suits to vindicate fundamental rights has been aptly described as "an unfortunate gap in the statutory jurisdiction of the federal courts," Wolff v. Selective Serv. Local Bd. No. 16, *supra*, 372 F.2d at 826, and some commentators have argued for its abolition in such cases. See American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 172 (1969) ; C. Wright, Federal Courts § 32, at 110 (2d ed. 1970) ; Currie, The Federal Courts and the American Law Institute (Part II), 36 U. Chi.L.Rev. 268, 295 (1969). See also Note, The Constitutional Implications of the Jurisdictional Amount Provision in Injunction Suits Against Federal Officers, 71 Colum.L.Rev. 1474 (1971).

onstrating the propriety of the invocation is not particularly onerous. The complaint need only show that in good faith he advances a nonfrivolous claim necessitating an application of federal law[50] and having a value meeting the statutory specifications.[51] When the action solicits damages, the amount sued for is deemed to have been fixed in good faith so long as it is not clear to a legal certainty that no recovery could satisfy the statutory standard.[52] Somewhat more is demanded when an injunction or other equitable relief is sought, though hardly more than the definitive valuation which a clear-cut presentation would entail.[53] But when, as here, a formal allegation of jurisdictional amount—albeit one sufficient from a pleading standpoint—is controverted, a factual issue emerges[54] and the burden of establishing jurisdictional amount is thrust upon the claimant.[55] We do not doubt the amenability of the right asserted by appellant to pecuniary valuation of a type acceptable for purposes of Section 1331(a).[56] The trouble here is that the demonstration which appellant

50. Baker v. Carr, 369 U.S. 186, 199, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Bell v. Hood, 327 U.S. 678, 681–682, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Chasis v. Progress Mfg. Co., 382 F.2d 773, 776 (3d Cir. 1967); Farkas v. Texas Instrument, Inc., 375 F.2d 629, 632 (5th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967); Stanturf v. Sipes, 335 F.2d 224, 227 (8th Cir. 1964), cert. denied, 379 U.S. 977, 85 S.Ct. 676, 13 L.Ed.2d 567 (1965).

51. Although the value of certain rights may be difficult of precise measurement, that difficulty does not make the claim non-justiciable under Section 1331(a). Spock v. David, *supra* note 49, at 8. Absolute certainty as to the amount is not essential; it suffices that there is a present probability that the damages or the right sought to be protected meet the statutory requirement. Friedman v. Machinists Int'l, 95 U.S.App.D.C. 128, 130, 220 F.2d 808, 810, cert. denied, 350 U.S. 824, 76 S.Ct. 51, 100 L.Ed. 736 (1955).

52. St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938); Gillentine v. McKeand, 426 F.2d 717, 720 (1st Cir. 1970); Arnold v. Troccoli, 344 F.2d 842, 845 (2d Cir. 1965); Spock v. David, *supra* note 49, at 8; Fireman's Fund Ins. Co. v. Railway Express Agency, 253 F.2d 780, 782 (6th Cir. 1958).

53. For a discussion of how the amount in controversy may be determined where injunctive relief is sought, see Tatum v. Laird, 144 U.S.App.D.C. 72, 76 & n. 6, 444 F.2d 947, 951 & n. 6 (1971), rev'd on other grounds, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). See also C. Wright, Federal Courts § 34 (2d ed. 1970); W. Barron & A. Holtzoff, Federal Practice and Procedure § 24, at 111–113 (Wright ed. 1960).

Some courts compute the amount on the basis of the value to the plaintiff of the right he seeks to protect. See, *e. g.*, Glenwood Light & Water Co. v. Mutual Light, Heat & Power Co., 239 U.S. 121, 126, 36 S.Ct. 30, 60 L.Ed. 174 (1915). Others look to the pecuniary result to either party which the judgment would produce. See, *e. g.*, Ronzio v. Denver & R. G. W. R.R., 116 F.2d 604, 606 (10th Cir. 1940). This is the preference of Professor Wright, see C. Wright, Federal Courts § 34, at 119 (2d ed. 1970), and the rule we favor. Tatum v. Laird, *supra*, 144 U.S.App.D.C. at 76 & n. 6, 444 F.2d at 951 & n. 6.

54. See, *e. g.*, Jaconski v. Avisum Corp., 359 F.2d 931, 934 (3d Cir. 1966); Yoder v. Assiniboine & Sioux Tribes, 339 F.2d 360, 362 (9th Cir. 1964).

55. McNutt v. General Motors Acceptance Corp., *supra* note 41, 298 U.S. at 189, 56 S.Ct. 780; Buck v. Gallagher, 307 U.S. 95, 102, 59 S.Ct. 740, 83 L.Ed. 1128 (1939); Gibbs v. Buck, 307 U.S. 66, 72, 59 S.Ct. 725, 83 L.Ed. 1111 (1939); KVOS, Inc. v. Associated Press, 299 U.S. 269, 278, 57 S.Ct. 197, 81 L.Ed. 183 (1936).

56. There is considerable disagreement as to whether a valuation is possible where basic civil rights are at stake and the claim is for equitable rather than financial redress. At one end of the spectrum are the courts which have held that such rights are incapable of monetary valuation, and thus that no jurisdiction lies under § 1331(a). See Goldsmith v. Sutherland, *supra* note 49, 426 F.2d at 1398; Giancana v. Johnson, *supra* note 49, 335 F.2d at 369; Boyd v. Clark, *supra* note 49, 287 F.Supp. at 564. On the opposite end are courts and judges espousing the view that some rights are so fundamental that their inherent worth

was summoned to make is nowhere to be found in the record.[57]

We do find, however, an adequate jurisdictional base, irrespective of the amount truly in controversy, in the provisions of D.C.Code § 11–521(a)(1) which were in force when appellant's suit was instituted in the District Court.[58] Those provisions gave the District Court "original jurisdiction of all

must be equal to any amount set for jurisdictional purposes. See Giancana v. Johnson, *supra* note 49, 335 F.2d at 371 (dissenting opinion) ; West End Neighborhood Corp. v. Stans, 312 F.Supp. 1066, 1068 (D.D.C.1970) ; Cortright v. Resor, 325 F.Supp. 797, 809 (S.D.N.Y.), rev'd on other grounds, 447 F.2d 245 (1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972) ; Boyd v. Clark, *supra* note 49, 287 F.Supp. at 568 (dissenting opinion) ; Murray v. Vaughn, 300 F.Supp. 688, 695–696 (D.R.I.1969).

The source of much of the discord in this area is the oft-quoted statement in Justice Stone's opinion in Hague v. CIO, 307 U.S. 496, 529, 59 S.Ct. 954, 970, 83 L.Ed. 1423 (1939), that "[t]here are many rights and immunities secured by the Constitution, of which freedom of speech and assembly are conspicuous examples, which are not capable of money valuation, and in many instances, like the present, no suit in equity could be maintained for their protection if proof of the jurisdictional amount were prerequisite." We are constrained to point out here that this declaration represented the view of only two members of the Court, a view which was diametrically opposed by other members. *Id.* at 507–508, 59 S.Ct. at 960 (opinion of Justice Roberts). The statement has never been adopted by a majority of the Court in any subsequent case, and its efficacy became the more doubtful when the Court recently concluded that "the dichotomy between personal liberties and property rights is a false one." Lynch v. Household Finance Corp., *supra* note 49, 405 U.S. at 552, 92 S.Ct. at 1122. With the remarkable expansion of remedies in damages to enable redress of invasions of an incalculable variety of personal interests, monetary valuation of fundamental civil rights seems hardly impossible today. Surely it was not impossible in this case. Compare Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L. Ed.2d 619 (1971) ; Bell v. Hood, 327 U.S. 678, 684–685, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ; Pinkerton Nat. Detective Agency v. Stevens, 108 Ga.App. 159, 132 S.E.2d 119, 124 (1963) ; Lukas v. J. C. Penney Co., 233 Or. 345, 378 P.2d 717, 721 (Or.1963) ; Cullen v. Dickenson, 33 S.D. 27, 144 N.W. 656, 658 (1913).

By our analysis, the value which a particular right may command in a given case is a different question from its susceptibility to any pecuniary valuation at all. As a matter of pure logic, the ability to attach a money value to a right is not necessarily the ability to assign it a value satisfying the jurisdictional requirement of § 1331(a). In Hague v. CIO, *supra*, three members of the Court felt that asserted rights of free speech and assembly had to meet the jurisdictional-amount test, and two others that it was impossible for them to do so. 307 U.S. at 507–508, 529–531, 532, 59 S.Ct. 954. The continuing undifferentiated application of that test and the assimilation of personal and property rights hardly signals an imminent departure from that aspect of *Hague.* See Lynch v. Household Finance Corp., *supra* note 49, 405 U.S. at 542, 546–552, 92 S.Ct. 1113. On the contrary, only recently this court adhered to the *Hague* approach. Tatum v. Laird, *supra* note 53, 144 U.S.App. D.C. at 74–76, 444 F.2d at 949–951. So notwithstanding a deep-seated feeling that price-tagging of fundamental human rights is dangerous business, we realize that any automatic finding of the required amount in controversy just because such rights are in issue may be a more simplistic solution than § 1331(a) will tolerate. Moreover, we find it hard to believe that demonstration of jurisdictional amount is a difficult undertaking where the right asserted is truly basic. At least for the time being, then, we will cling to the middle course which permits complainants in suits under § 1331(a) for injunctive relief against federal and District officers to allege and show that the value of the rights sought to be protected exceeds the required jurisdictional amount. *Compare* Wolff v. Selective Service Local Bd. No. 16, *supra* note 49, 372 F.2d at 826 and Spock v. David, *supra* note 49, at 8.

57. Compare Hague v. CIO, *supra* note 56, 307 U.S. at 507–508, 59 S.Ct. 954.

58. "Except in actions or proceedings over which exclusive jurisdiction is conferred by law upon other courts in the District, the United States District Court for the District of Columbia, in addition to its jurisdiction as a United States district court and to any other jurisdiction con-

. . . civil actions between parties, where either or both of them are resident or found within the District," save where "exclusive jurisdiction is conferred by law upon other courts in the District." [59] The record shows amply the required residency, and we think the exclusivity requirement was met also.

We are mindful that, when appellant brought his suit, the District of Columbia Court of General Sessions [60] possessed "exclusive jurisdiction of civil actions . . . in which the claimed value of personal property or the debt or damages claimed does not exceed the sum of $10,000, exclusive of interest and costs." [61] That does not affect the conclusion we reach because appellant's goal was equitable relief of a type which the Court of General Sessions could not award. While that court undoubtedly possessed some equitable powers,[62] it has

long been settled that they were confined to controversies which fell within its statutory grant of jurisdiction.[63] So, although the Court of General Sessions had such equitable powers as were necessary to enable it to fully exercise the jurisdiction conferred,[64] those powers were incidental and limited to just that, and not primary or more general than the exigencies of the jurisdictional exercise required.[65]

Appellant did not seek recovery of any "personal property or" any "debt or damages," [66] He sued, rather, for declaratory and injunctive relief to protect a fundamental personal right. It is clear that the Court of General Sessions lacked authority to entertain that suit [67] and that, by the same token, the District Court acquired jurisdiction under Section 11–521(a)(1) [68] when the complaint was filed. And notwithstanding the

---

ferred by law, has all the jurisdiction possessed and exercised by it on January 1, 1964, and has original jurisdiction of all . . . civil actions between parties, where either or both of them are resident or found within the District. . . ." D.C.Code § 11–521(a)(1) (1967).

59. See note 58, *supra*.

60. Now the Superior Court of the District of Columbia. D.C.Code § 11–901 (Supp. V 1972).

61. "In addition to other jurisdiction conferred upon it by law, the District of Columbia Court of General Sessions has exclusive jurisdiction of civil actions, including civil actions against executors, administrators and other fiduciaries, in which the claimed value of personal property or the debt or damages claimed does not exceed the sum of $10,000, exclusive of interest and costs, as well as of all crossclaims and counterclaims interposed in all actions over which it has jurisdiction, regardless of the amount involved." D.C.Code § 11–961(a) (1967).

62. See Klepinger v. Rhodes, 78 U.S.App. D.C. 340, 341, 140 F.2d 697, 698, cert. denied, 322 U.S. 734, 64 S.Ct. 1047, 88 L.Ed. 1568 (1944); Sheherazade, Inc. v. Mardikian, 143 A.2d 512, 514 (D.C.Mun. App.1958).

63. Paley v. Solomon, 59 F.Supp. 887, 888 (D.D.C.1965); Sheherazade, Inc. v. Mardikian, *supra* note 62, 143 A.2d at 514; Psarakis v. Dukane, Inc., 84 A.2d

543, 544 (D.C.Mun.App.1951); Thomas v. Marvins Credit, 76 A.2d 773, 774 n. 1 (D.C.Mun.App.1950).

64. Brewer v. Simmons, 205 A.2d 60, 63 (D.C.App.1965); Villacres v. Haddad, 184 A.2d 634, 636 (D.C.Mun.App.1963); Paton v. District of Columbia, 180 A.2d 844, 845 (D.C.Mun.App.1962); Friedman v. District of Columbia, 155 A.2d 521, 522 (D.C.Mun.App.1959); Sheherazade, Inc. v. Mardikian, *supra* note 62, 143 A.2d at 514.

65. Thus, the Court of General Sessions possessed jurisdiction of an action to have a trust impressed upon funds amounting to $1,980 or alternatively for a money judgment, see Klepinger v. Rhodes, *supra* note 61, but not of an action by property owners to cancel a special tax assessment for paving improvements, see Paton v. District of Columbia, *supra* note 64, or a suit for an injunction against the assertion of a lien on property for an unpaid water bill and to restrain the delivery of a tax deed for the property, see Friedman v. District of Columbia, *supra* note 64.

66. See note 61, *supra*.

67. See text *supra* at notes 62–66. Compare Tatum v. Laird, *supra* note 53, 144 U.S. App.D.C. at 75 n. 5, 444 F.2d at 950 n. 5 and Peoples v. United States Dept. of Agriculture, 138 U.S.App.D.C. 291, 294, 427 F.2d 561, 564 (1970).

68. See note 62, *supra*.

subsequent repeal of that section,[69] the jurisdiction it conferred over this litigation subsists today.[70]

The case is remanded to the District Court for such further proceedings in harmony with this opinion as appellant may be inclined to initiate.

So ordered.

BAZELON, Chief Judge (concurring in part and dissenting in part):

I agree that this case should be remanded for further proceedings. But, I object to the court's apparent failure to recognize our obligation to seek the earliest possible resolution of this more than five year old law suit by providing some guidance for the District Court's consideration. Otherwise, the delay may take its toll in the deprivation of basic constitutional rights, the exacerbation of friction between the police and the ghetto community, and the loss of the courts' credibility.

I

There is clearly substantial evidence to support the District Court's finding that "presently vagrancy observations [the police practice originally complained of] result from 'spot check' observation forms." [1] The court today does not say otherwise; it accepts the District Court's findings as "impregnable" because not challenged on appeal. The history of the "spot check" procedure makes it quite clear that it is but the vagrancy observation of old, with name and form number changed, but the same unconstitutional standard.

In response to this court's *Ricks* decisions,[2] the police department issued the so-called *Layton* memorandum of February 17, 1969. That document, dealing in part with vagrancy observations, said:

> . . . [T]he arrest policies announced herein do not preclude an officer from *observing persons engaged in suspicious activity in a public place and from approaching those persons and making inquiry.* . . . In those circumstances where a person refuses to identify himself or does not give a reasonable explanation of his conduct, the officer should make an accurate and detailed record of the person's physical description and other significant characteristics, clothing worn and the explanations furnished. (Emphasis added) [3]

The "spot check," in contrast, began its existence as a traffic enforcement device, to be employed with a view towards "detecting persons operating without a valid driving license." [4] However, after the Supreme Court decided Terry v. Ohio,[5] the "spot check" underwent a major transformation in both purpose and scope. The new purpose was described in police department communications as follows:

> Effective use of this new PD 725 spot check form in recording suspicious persons . . . in our area can be an invaluable aid in assisting in this District's effort to control crime and identify and apprehend offenders.[6]

69. District of Columbia Court Reorganization Act of 1970, Pub.L. No. 91–358, § 111, 84 Stat. 475 (1970).

70. D.C.Code § 11–501(1) (Supp. V 1972).

1. Gomez v. Wilson, 323 F.Supp. 87, 90 (D.D.C.1971).

2. Ricks v. District of Columbia, 134 U.S. App.D.C. 201, 414 F.2d 1097 (1968); Ricks v. United States, 134 U.S.App.D.C. 215, 414 F.2d 1111 (1968).

3. Memorandum Regarding Vagrancy . . . Observations and Arrests, Metropolitan Police Dept., Feb. 17, 1969, Joint App. at 241–243.

4. Memorandum Concerning Traffic Law Enforcement, Metropolitan Police Dept., Nov. 3, 1964, Joint App. at 275; see Second District Memorandum No. 237, Dec. 19, 1969, Joint App. at 277–278.

5. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

6. Second District Memorandum No. 230, June 12, 1970, Joint App. at 280–281. It is clear from the record that the other Districts in the Metropolitan Police Dept. use Form PD 725 in the same way. Joint App. at 264.

Another police communication, certainly reminiscent of the *Layton* memorandum, further explains the expanded use of spot checks:

> The traffic check form currently in use shall also be used for *stopping and checking suspicious persons on foot.* Members shall take the person's name, nickname, date of birth, address, location of stop, general physical description and description of clothing worn. (emphasis added) [7]

Most importantly, the spot check procedure authorized the stopping of pedestrians under the same vague standard—mere "suspicion"—as the earlier vagrancy observations. It seems clear that spot checks are but another way of implementing the policy of the *Layton* memorandum.[8]

## II

The District Court correctly determined that spot checks are an unconstitutional police practice, a conclusion the court today characterizes as "impregnable". The District Judge properly rejected the Government's assertion that because a person who is stopped has an unspoken right to continue walking and ignore a policeman's inquiries, he has not been seized. The memoranda describing the practice themselves cast doubt on the accuracy of the government's suggestion. And the Supreme Court in *Terry* held that the stop stage of an encounter is coextensive with a seizure, hence within the purview of the 4th Amendment.

> It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.[9]

As the trial judge perceptively observed, when a policeman stops and questions a person, the officer's "uniform, badge and all other indicia of his power as a law enforcement authority" compel an obedient response. The person is surely "restrained."

In *Terry* and related cases [10] the Court also carefully defined by what standards a police officer's intrusion on an ordinary citizen's privacy would be constitutionally permissible. Those cases held that an officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." [11] In contrast,

7. Second District Memorandum No. 14, Jan. 13, 1970, Joint App. at 282.

8. While there are distinctions between the arrest procedures following vagrancy observations and spot checks, those differences are irrelevant here, since we are concerned only with the initial stop and interrogation.

   The "spot check" does, however, involve a different question than the Police Dept.'s "stop and frisk" policies at issue in Hall v. United States, 148 U.S.App. D.C. 42, 459 F.2d 831 (1972) (en banc); Long v. District of Columbia, 152 U.S. App.D.C. 187, 469 F.2d 927 (1972); or the lengthy guidelines referred to by the court, *supra*, at 415.

9. 392 U.S. at 16, 88 S.Ct. at 1877. *But cf. Id.* at 19, 88 S.Ct. 1868. If the pedestrian's right to walk away were clearly articulated, the question of whether there was a seizure would, of course, be more difficult. But that is not the procedure at issue. Nor is the application of the spot check procedure on either a random basis or to vehicle stops involved in this case. For a discussion of vehicle spot checks, *see* United States v. Robinson, 153 U.S.App.D.C. 114, 141, 471 F.2d 1082 (1972) (en banc), at 1109 (separate opinion of Chief Judge Bazelon).

10. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L. Ed.2d 917 (1968). *Adams* deals only with whether a *Terry* stop can be based on the tip of an informer. It does not liberalize the *Terry* standard as described herein. *See* Long v. District of Columbia, 152 U.S.App.D.C. 187, 195, 469 F.2d 927, 935 (1972) (Wright, concurring).

11. 392 U.S. at 21, 88 S.Ct. 1868, 1880. The *Terry* standard was later characterized by Mr. Justice Marshall as follows:

    > [The] police officers . . . must have specific facts from which they can infer that an individual is engaged in criminal activity. . . .

spot check stops are authorized on mere *suspicion*.

The Supreme Court of Pennsylvania recently struck down that state's similar vehicle spot check procedure. Although noting that such stops may serve a law enforcement purpose, the court declared them unconstitutional under the *Terry* test. The court warned that if the police were allowed to stop automobiles without being able to "point to specific and articulable facts", they could intrude on "basic constitutional rights on the basis of subjective prejudices." [12]

The government admitted at oral argument in this case that the spot check does not meet *Terry* standards. Accordingly, the District Court properly found that police interferences with the appellant's late night walks pursuant to a mere "suspicion' standard were unconstitutional and the court's injunction restrained the police from stopping Gomez under the guise of either a vagrancy observation or spot check. [13]

### III

I turn now to the question of remedy. We have said that the District Court found Gomez had been the victim of unconstitutional police action. The question that court must face on remand is whether this conduct is sufficiently widespread to sustain class action relief.

It is important to note that we are not here faced with the mere assertion of a solitary isolated incident, as we were in Long v. District of Columbia, where the court observed:

In [Gomez] there was an official, publicly adopted policy . . . under attack. There was no question that the procedures objected to occurred regularly and would occur again in the future. [14]

The President's 1967 Crime Commission suggested that the courts recognize "the importance of the administrative policymaking function of [the] police" and "take appropriate steps to make this a process which is . . . articulate and responsive to external controls appropriate in a democratic society." [15] Likening the police policymaking function to that of an administrative agency, the Commission called on the courts to develop judicial remedies that would "require the law enforcement agency to articulate its policy and to defend it, and if the challenge is successful to change the policy." [16] The Commission specifically referred to the need for such an articulation and review of police policies about street investigative stops. [17]

The American Bar Association has also focused on the need for providing positive guidance to the police, "rather than concentrating solely on penalizing

Adams v. Williams, 407 U.S. 143, 158, 92 S.Ct. 1921, 1929, 32 L.Ed.2d 612 (1972) (Marshall, J., dissenting).

This articulation of the *Terry* standard provides a marked contrast to the statement of a District police officer as to his understanding of the standard for making a pedestrian spot check:

Anyone that acts in a suspicious manner or draws my attention to them for whatever incident it might be, . . . well just a person of suspicious nature [may be stopped].

Deposition of Officer John Ferguson, Joint App. at 203, 210–211.

12. Commonwealth v. Swanger, 300 A.2d 66 (Sup.Ct., Pa.1973).

13. If the court did not find that the spot check was an infringement on the appellant's constitutional rights it could not have purported to enjoin the police from stopping him in the course of a spot check. Clearly, however, the District Court does enjoin the police from stopping Gomez in the course of either a spot check or vagrancy observation as long as he is sober, well behaved, and in conformance with the law.

14. Long v. District of Columbia, 152 U.S. App.D.C. 187, 469 F.2d 927, 933 (1972).

15. The President's Commission on Law Enforcement and the Administration of Justice, Task Force Reports: The Police at 18 (1967).

16. *Id.* at 32.

17. *Id.* at 185–186; *see* note 28, *infra*, and accompanying text.

**426**

improper police conduct," [18] as by application of the exclusionary rule.[19] The ABA Report specifically approved of "injunctive actions to terminate a pattern of unlawful conduct." [20]

The class action injunctive suit is one means by which the police can be required to identify, articulate, and defend, as well as be afforded an opportunity to change, their official policies and practices. The class action, by its very nature, focuses on the broad policy rather than the individual incident. Hence, it provides the kind of positive guidance suggested by the ABA and the kind of remedy called for by the Crime Commission. But, it can only be a workable remedy if there is not an intolerable burden on a petitioner to demonstrate the widespread scope of application of an *articulated police policy*.[21] It is illogical, if not irrational, to require a plaintiff to establish that the five thousand men and women of the Metropolitan Police Department are doing what they have been instructed to do. Rather, where a petitioner shows that a police practice, as described in official communications or regulations, is unconstitutional, the burden of going forward should shift to the police on the question of whether the application of the practice is widespread.

**IV**

The already lengthy history of this litigation indicates that it may yet be far from over. As to the interim period, the record suggests the propriety of a preliminary injunction against spot checks not meeting *Terry* standards. The appellant has not requested relief pendente lite; but, on remand, the District Court may properly entertain a petition for such relief. The requirements are as follows:

1) the party in whose favor the relief is to run must make a strong showing that he is likely to ultimately prevail on the merits;

2) there must be a danger of irreparable injury;

3) to be balanced against the extent to which the relief would harm the other party; and

4) the court must determine where lies the public interest.[22]

As to the likelihood of appellant's success on the merits, it is already clear that the spot check procedure does not meet the test articulated in *Terry*. The issue on remand is the proper scope of relief. The official police documents describing spot checks and the affidavits of the appellant and other citizens who have been subjected to unlawful street stops and interrogations,[23] if accurate, would support the conclusion that the spot check procedure is sufficiently widespread to justify an injunction in favor of the class suggested by appellant. But those affidavits were not before the District Court nor were they properly before this court.

The District Court should also consider to what extent its limited relief has been effective to protect the appellant.

18. American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to The Urban Police Function (Approved Draft, 1973) at § 5.1, in 12 Crim.L.Rep. 3133 (1973).

19. The ABA did, however, vote its disapproval of legislation aimed at curtailing the application of the exclusionary rule. 12 Crim.L.Rep. 1077 (1973). *See* note 29, *infra*.

20. Standards Relating to The Urban Police Function, note 18, *supra*, at § 5.3.

21. *See* discussion at 428, *infra*.

22. *See, e. g.* Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969); District 50, United Mine Workers of America v. International Union, United Mine Workers of America, 134 U.S.App.D.C. 34, 412 F.2d 165 (1969).

23. Court's opinion, *supra*, at 416 n. 26–28; affidavits submitted in support of a motion for rehearing and suggestion for rehearing *en banc* in Long v. District of Columbia, No. 71–1072 (D.C.Cir. Dec. 4, 1972); Daugherty v. United States, 272 A.2d 675 (D.C.C.A.1972) (appellant stopped on mere suspicion).

Evidence has been proffered to us that the appellant himself has been stopped twice more since the entry of that order.[24] Thus the question arises whether the rights of appellant or any individual can be adequately protected without protecting those of the public generally. It is hardly likely that the appellant is the only person being stopped and interrogated pursuant to the unconstitutional spot check procedures. "[O]nce [an unconstitutional practice] is found, . . . the court must order . . . it discontinued [and its] decree may not—either expressly or impliedly—authorize [its continuation] against others."[25]

The District Court will also have to determine whether there is a danger of immediate and irreparable injury. It may find that if preliminary relief is not granted, no protection will be afforded the public from these unconstitutional street stops pending this litigation[26]—since whatever permanent injunctive or declaratory relief is ultimately granted will have only prospective effect. The court could thus measure the cost of its delay in terms of the infringements on the constitutional rights of all those citizens who, in the months or years before this case reaches its long overdue conclusion, will be illegally detained by the police. The value of the resultant loss of constitutional rights is neither easily measurable nor, as a practical matter, fully compensable in dollars and cents.[27]

The court may not ignore what might be lost by the government should a preliminary injunction issue. Courts certainly should not involve themselves unnecessarily in police matters and should consider the degree to which proper activity and discretion may be curtailed by the preliminary relief. But if unconstitutional street stops are widespread, the police would properly be enjoined from undertaking them at all in the future. And if spot checks not meeting *Terry* standards are not widespread, what is lost by a narrowly drawn order restraining an uncommon practice?

The final element to be weighed by the District Court is the public interest. In this inquiry, I do not think the court can ignore who the appellant and his lawyer are. The appellant is a poor man and a member of a racial minority. The President's 1967 Crime Commission observed that police field interrogations are directed predominantly at and often conducted indiscriminately among that very class of citizens. As a result, the Commission warned, street stops are a major source of friction between police and minority groups, creating resentment of the police in the urban ghettos.[28] It would surely seem in the public interest to minimize such friction by at

---

24. The affidavits recounting these events are again outside the record on appeal but may be submitted to the District Court in support of the motion for preliminary injunctive relief.

25. Potts v. Flax, 313 F.2d 284, 289 (5th Cir. 1963).

26. As the Supreme Court observed in *Terry*, 392 U.S. at 13–14, 88 S.Ct. at 1876, the exclusionary rule may not be effective protection in this context, since it is:

> . . . powerless to deter invasions of constitutionally guaranteed rights where the police either have no interest in prosecuting or are willing to forego successful prosecution in the interest of serving some other goal. . . . The wholesale harassment by certain elements of the police community, of which

minority groups . . . frequently complain, will not be stopped by the exclusion of any evidence from any criminal trial.

27. *See, e. g.*, Lankford v. Gelston, 364 F.2d 197, 202 (4th Cir. 1966) (explaining why money damages are an inadequate remedy for police misconduct).

28. The President's Commission on Law Enforcement and the Administration of Justice, Task Force Reports: The Police 183–185 (1967); *see* Terry v. Ohio, 392 U.S. 1, 14–15 n. 11, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968); Lankford v. Gelston, 364 F.2d 197, 204 (4th Cir. 1966); Tiffany, McIntyre & Rotenberg, Detection of Crime: Stopping and Questioning, Search and Seizure, Encouragement and Entrapment 47–48 (1967).

least insuring that street stops are carried out in a way consonant with Constitutional guarantees.[29]

## V

The guarantees of the Constitution exist for all men, rich and poor alike. But to say that such rights exist for all men is only meaningful if both rich and poor have the means to secure them. Since appellant is a poor man, he could not himself afford the crippling cost of this extended litigation. He would not be before the courts today were it not for the voluntary representation of the American Civil Liberties Union, whose resources, it now appears, may be insufficient for the burdens imposed by the courts.[30] The court has a moral as well as a legal obligation to be mindful of these matters [31] in considering this case.

Nonetheless, the court today is sending appellant back to the District Court once more without meaningful relief and without any guidelines for that court's consideration of an appropriate remedy. The court is, in effect, sending appellant back down to the bottom of the hill that he began climbing five long years ago, and instructing him to begin anew. In my view, the District Court should be instructed on remand to consider the affidavits presented to us, as well as other matters,[32] in accordance with some guidance from us for the determination of appropriate interim relief.

## VI

The complaint in this case has been before the courts for more than five years. The police have been defending on the ground that their spot check procedure is proper. It may then well be that they have been engaging in that practice every day, all day long, while the complaint is unresolved. Since we piously refrain from expediting the solution, we are part of the problem. What credibility do we then have in urging the victims of police misconduct to rely on the courts—not on the streets—to redress their grievances?

29. By decreasing the incidence of police misconduct through suits like the one before us, we may also alleviate the burden of the oft criticized exclusionary rule. Class action injunction suits against police misconduct thus appear to be one step towards a "workable remedy" suggested by the Chief Justice in Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 421, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, Chief Justice, dissenting).

30. It is too well known for doubt that the resources of the ACLU do not permit the kind of far flung investigation which the history of this litigation seems to envision. And, according to recent reports, OEO legal assistance for the vindication of guaranteed rights is about to be withdrawn. *See, e. g.,* Washington Post, February 17, 1973, A1 col. 1.

31. *See* Boddie v. State of Conn., 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

32. See notes 23 and 24, *supra,* and accompanying text.